David McKivitt WILLIAMS

v.

Jonas R. RAPPEPORT and Alice Dvoskin.

Civ. No. K–87–292.

United States District Court, D. Maryland.

June 9, 1988.

502

David McKivitt Williams, Chestertown, Md., pro se.

J. Joseph Curran, Jr., Atty. Gen. of Md., James G. Klair, Julia M. Freit, Asst. Attys. Gen., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, Senior District Judge.

This case arises out of a hotly disputed state court custody battle between former spouses over their only child. Plaintiff David Williams brings this action against psychiatrist Jonas Rappeport and psychologist Alice Dvoskin, in connection with their roles in that state court custody litigation, seeking damages and injunctive relief for alleged constitutional violations pursuant to 42 U.S.C. §§ 1983 and 1985, and for state claims pursuant to the doctrine of pendent jurisdiction. Williams contends that Drs. Rappeport and Dvoskin conspired with his former wife, Joan Turner, the state court judges involved in the custody case, *Turner v. Williams*, Equity No. 6206 (Circuit Court for Talbot County, Maryland), and others, to deprive him of custody of his daughter pursuant to a policy which discriminates against men in custody cases. Williams has sued those judges and others in two related cases pending in this court, *Williams v. Anderson*, Civil No. K–85–1646, and *Williams v. North*, Civil No. K–85–3088.[1]

Williams was awarded custody of his daughter in March, 1978, in *Turner v. Williams, supra*, an action brought by Ms. Turner to obtain custody following the couple's divorce. During the daughter's visit with her mother in Virginia in September, 1984, Ms. Turner sought, and Judge John North, II issued, an *ex parte* order of the Circuit Court of Talbot County transferring custody of the child to her mother.

In August, 1985, after efforts by Williams to regain custody of the child, Judge North placed the child in a boarding school in Pennsylvania, and later ordered professional evaluations of both parents and of the child. The evaluations were to be conducted outside Talbot County because of the publicity associated with the custody battle and the high visibility of the parents. Judge North asked Dr. Rappeport, a psychiatrist, to conduct the examinations in his capacity as a private practitioner. Dr. Rappeport is also the director of the Medical Office of the Circuit Court for Baltimore City. Dr. Rappeport agreed to undertake the evaluations but, in view of Ms. Turner's financial status, suggested that the matter be handled through the Medical Office. Judge North agreed and issued an Order for Psychiatric and Psychological Treatment, dated February 26, 1986, referring the child and the parents to Dr. Rappeport and Dr. Dvoskin, a psychologist at the Medical Office. Dr. Dvoskin conducted the evaluations, obtained Dr. Rappeport's review and approval, and reported her findings to Judge North on May 6, 1986, apparently recommending that the child be placed in the mother's custody and sent to a boarding school. Both defendant doctors later testified to the contents of the evaluation report at a custody hearing before Judge North, who then determined to follow their recommendation.

This case centers on Williams' claim that "Dvoskin and Rappeport somehow reached an understanding and a meeting of the minds with Judge North ... and Joan Turner to deprive the plaintiff of the custody of his child, the right to supervise, protect and care for his child, without due process of law and in violation of his right to equal treatment or equal protection of

---

1. Those two cases were stayed by Order of this court dated December 18, 1985 pending resolution of the underlying state custody proceeding. *See Williams v. North*, 638 F.Supp. 457, 463 (D.Md.1986). In *Williams v. North*, 685 F.Supp. 502 (D.Md.1988), this court decided the issues involving the state court judges. Plaintiff's claims against the non-judge defendants in *Williams v. North*, Civil No. K–85–3088, and the two defendants in *Williams v. Anderson* remain subject to the stay and will be decided at a later date. Williams' claims against Drs. Rappeport and Dvoskin are all determined in this opinion.

the law all bottomed upon sexual preference and bias against the male sex in favor of the female sex." [2] Williams also asserts violations of his rights under Maryland law, including his right to privacy and his right to be free of a conspiracy to deprive him of the custody of his child.

Drs. Rappeport and Dvoskin have moved to dismiss Williams' complaint on the grounds that (1) they did not act under color of state law; (2) Williams has not stated a claim for violation of any rights protected by section 1983; (3) Williams has failed to state a claim cognizable under section 1985(3); and (4) they are entitled to absolute immunity as judicial officers. In response to a request by this court, defendants filed affidavits of Judge North and Drs. Rappeport and Dvoskin. Williams, although given the opportunity, did not submit any further documents in form appropriate under Fed.R.Civ.P. 56. Since documents in addition to pleadings are included in the record in this case, defendants' motion to dismiss is treated as a motion for summary judgment pursuant to Fed.R. Civ.P. 12(b)(6) and 56. For the reasons discussed below, this court concludes that Williams has stated a cause of action under section 1983 and also section 1985(3), but may not prevail because the two defendant doctors are entitled to absolute immunity.

### I. *1983 and Acting Under Color of State Law*

Williams, in order successfully to state a section 1983 claim, must establish that the defendants acted under color of state law and deprived Williams of a right secured by the federal Constitution or a federal statute. *See Parratt v. Taylor,* 451 U.S. 527, 535–36, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). Defendants contend that, as court-appointed professionals, they were acting as an arm of the judiciary and therefore were not acting under color of state law.

A person acts under color of state law "only when exercising power 'possessed by

virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson,* 454 U.S. 312, 317–18, 102 S.Ct. 445, 449, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)) (footnote omitted). "The ultimate issue in determining if a person is subject to suit under § 1983 is whether the alleged infringement of federal rights is fairly attributable to the state.... This is a factbound inquiry." *Calvert v. Sharp,* 748 F.2d 861, 862 (4th Cir.1984), *cert. denied,* 471 U.S. 1132, 105 S.Ct. 2667, 86 L.Ed.2d 283 (1985).

In *Calvert,* Judge Chapman concluded that a physician privately employed by a nonprofit professional corporation "employing numerous physicians and other health personnel," *id.* at 862, did not act under color of state law when he provided medical services to a prisoner in the Maryland penitentiary because the physician "had no supervisory or custodial functions," *id.* at 863, "owe[d] his ethical obligation and undivided loyalty to his patient," *id.,* and was not engaged in a function which traditionally had been the "exclusive prerogative of the state." *Id.* at 864. *But see Ort v. Pinchback,* 786 F.2d 1105, 1107 (11th Cir. 1986) (physician who contracted with the state to provide medical care to inmates was acting under color of state law, since "he took over the state's responsibility for attending to inmate medical needs").

When a professional, whether a public defender or a psychiatrist, is "not amenable to administrative direction in the same sense as other employees of the State," *Polk County,* 454 U.S. at 321, 102 S.Ct. at 451, and when the professional-client relationship mirrors a similar relationship in private practice, state action is not involved. In *Polk County,* Justice Powell wrote that a public defender, though appointed by the state, as "a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior." *Id.* The state could not interfere with the attorney's rec-

ognized duty to protect "the undivided interest of his client." *Id.* at 318–19, 102 S.Ct. at 450 (quoting *Ferri v. Ackerman,* 444 U.S. 193, 204, 100 S.Ct. 402, 409, 62 L.Ed.2d 355 (1979)). Further, the state itself has a duty to "respect the professional independence of the public defenders whom it engages." *Id.* 454 U.S. at 321–22, 102 S.Ct. at 451 (footnote omitted). In *Jackson v. Salon,* 614 F.2d 15 (1st Cir.1980), then Chief Judge Coffin wrote "that court-appointed counsel works primarily for the benefit of his indigent client and only indirectly for the benefit of the state or society in general, and in this relationship counsel is controlled by the wishes of his client and his independent professional judgment while he is in no significant way controlled by the state to which his client's interests are legally adverse." *Id.* at 17.

■ Neither Dr. Rappeport nor Dr. Dvoskin owed an independent obligation to Williams or possessed freedom from state control. Dr. Rappeport himself notes in his affidavit that his evaluations of Williams, the child, and the mother were conducted by a public office, *i.e.,* the Medical Office of the Circuit Court for Baltimore City. Both Dr. Rappeport and Dr. Dvoskin performed their duties as public employees, not as private practitioners, and were paid by the Medical Office for the services they rendered. Additionally, both professionals regarded their primary duty as running to the court and not to Williams, the mother, or the child. That conclusion is buttressed by Judge North's order, which required the parties to "execute all necessary releases so the aforesaid doctors can evaluate and

report to the court without hinderance of doctor/client privilege." [3] The substance of the interviews and analyses by both doctors ultimately was disclosed in court. Accordingly, since Drs. Rappeport and Dvoskin were public employees appointed by the court to assist Judge North, saw their responsibility running to the court and owed no ethical duty to protect the interests of any individual, both defendants acted under color of state law.[4]

## II.   *1983 and the Violation of Federal Constitutional or Statutory Rights*

■ Defendants also contend that the record lacks factual support for a claim that defendants deprived Williams of any rights or interests secured by the federal Constitution or any law of the United States. Williams' 37–page Amended Complaint is replete with allegations and claims but none is cogently pleaded. Williams does appear, however, to have stated one colorable substantive due process claim. Count Five of the Amended Complaint, titled "Violation of Civil Rights," seems to assert that defendants deprived Williams of his liberty interest in rearing his child.

■ The Constitution imposes limitations on government action with respect to certain private family decisions, such as those relating to contraception, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), sending one's children to religious or public school, *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and guiding the develop-

---

**3.** Order for Psychiatric and Psychological Evaluations (February 27, 1986). Exhibit to Complaint.

**4.** *Hall v. Quillen,* 631 F.2d 1154 (4th Cir.1980), *cert. denied,* 454 U.S. 1141, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), upon which defendants rely, is not to the contrary. In *Sumpter v. Harper,* 683 F.2d 106 (4th Cir.1982), Judge Bryan noted that *Hall* stands for the proposition that "a physician, even when acting under court appointment, does not do so 'under color of state law' by merely practicing medicine ... where the only link is a State license to practice." *Id.* at 108. The physician in *Hall* apparently was a private psychiatrist appointed by the court to evaluate the plaintiff in connection with his

commitment to a state hospital. In this case, the defendants are employed by a public agency. Other cases citing *Hall* also involve physicians who did not work for a public agency and who did not appear to perform evaluations for the court as a normal part of their practice, as does the medical office for which Drs. Rappeport and Dvoskin work. *See, e.g., Anderson v. Glismann,* 577 F.Supp. 1506, 1508–09 (D.Colo. 1984); *but see Plain v. Flicker,* 645 F.Supp. 898 (D.N.J.1986), where a private New Jersey physician's certification of commitment of the plaintiff to a state hospital—made pursuant to a state statute requiring certification by a licensed physician—was considered a state function subjecting the physician to a § 1983 action.

ment of and retaining the custody and companionship of the child, *Lassiter v. Dep't of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). When a state seeks to affect the relationship of parent and child in furtherance of a legitimate state interest, a fundamental constitutional right is implicated. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of the rights of parents with respect to their natural children); *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (determining paternity); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (determining whether an unwed father may retain custody of his children after their mother's death); *Trujillo v. Board of County Commissioners of the County of Santa Fe,* 768 F.2d 1186 (10th Cir.1985) (mother and daughter could bring a § 1983 action arising out of the death of their son and brother on the basis that the mother and sister had an interest in continued intimate association with their son and brother); *Kelson v. City of Springfield,* 767 F.2d 651, 653–54 (9th Cir.1985) (parents possess a constitutionally protected liberty interest in continued association with their children). While the outer boundaries of the right to rear one's child are not clear, particularly when a parent's rights have not been completely terminated, Williams has alleged a violation of a liberty interest sufficient to withstand defendants' pending motion.

### III. *1985(3)*

■ Although Williams has not specified the subsection of section 1985 under which he sues, his claims arguably implicate section 1985(3) because he asserts that Drs. Rappeport and Dvoskin conspired with each other and with Judges North and Rasin, and Joan Turner to deprive him of custody of his daughter. Section 1985(3) states in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

For conduct to be actionable under section 1985(3) "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (footnotes omitted).

Defendants contend that Williams has not alleged the class-based discrimination necessary to state a valid § 1985(3) claim. But, once again, while the contours of Williams' claims are vague, a liberal reading of his complaint supports a conspiracy claim based on sex discrimination. Williams alleges that "it is the official policy of the Judges and Courts of the Second Judicial Circuit . . . to foster and promote sexual preference in custody cases . . . in favor of the female sex and amounts to a state or a government enforcement of a sexually discriminating policy." [5]

Further, plaintiff's allegations tie both defendants to the alleged conspiracy by claiming that Drs. "Dvoskin and Rappeport somehow reached an understanding and a meeting of the minds with Judge North, Judge Rasin, and Joan Turner, to deprive the plaintiff of the custody of his child." [6]

■ Whether conspiracies motivated by sex discrimination are actionable under section 1985(3) has not been addressed by the

---

**5.** Amended Complaint ¶ 58.

**6.** Amended Complaint ¶ 59.

Supreme Court or the Fourth Circuit. However, the Third and Fifth Circuits have concluded that sex discrimination is within the reach of section 1985(3). In *Novotny v. Great American Federal Savings and Loan Ass'n*, 584 F.2d 1235 (3rd Cir.1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), Judge Adams wrote:

> The principle that individuals should not be discriminated against on the basis of traits for which they bear no responsibility makes discrimination against individuals on the basis of immutable characteristics repugnant to our system. The fact that a person bears no responsibility for gender, combined with the pervasive discrimination practiced against women, and the emerging rejection of sexual stereotyping as incompatible with our ideals of equality convince us that whatever the outer boundaries of the concept, an animus directed against women includes the elements of a "class-based invidiously discriminatory" motivation.

*Id.* at 1243 (footnotes omitted). Although Judge Adam's decision in *Novotny* was vacated on other grounds, subsequent Third Circuit cases have treated his holding regarding section 1985(3) as good law.[7] *See, e.g., C & K Coal Co. v. United Mine Workers*, 704 F.2d 690, 700 (3d Cir.1983); *Skadegaard v. Farrell*, 578 F.Supp. 1209, 1218–19 (D.N.J.1984). *See also Conroy v. Conroy*, 575 F.2d 175, 177 (8th Cir.1978); *Tufts v. Bishop*, 551 F.Supp. 1048, 1050 (D.Kan. 1982). The Fourth Circuit has also intimated—but not held—that sex-based discrimination is actionable under section 1985(3). In *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir.1985), Judge Russell wrote:

> To meet the requirement of a class-based discriminatory animus, under this section the class must possess the "discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin, and sex."

*Id.* at 1257 (quoting *Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025, 1028 (E.D.

Va.1973), *aff'd*, 508 F.2d 504 (4th Cir.1974)). *See also Life Insurance Co. of North America v. Reichardt*, 591 F.2d 499, 505 (9th Cir.1979) (women purchasers of insurance meet the § 1985(3) class requirement).

Accordingly, Williams, alleging a gender-based conspiracy, has stated a cognizable claim under section 1985(3).

### IV. *Immunity*

Although Williams' complaint does state a cause of action under both sections 1983 and 1985(3), the complaint cannot withstand defendants' assertion of absolute quasi-judicial immunity.

A judge is entitled to absolute immunity from suits for damages unless he acted "in the 'clear absence of jurisdiction.'" *Stump v. Sparkman*, 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1872)). In *McCray v. Maryland*, 456 F.2d 1 (4th Cir.1972), Judge Sobeloff wrote that absolute judicial immunity

> is matchless in its protection of judicial power.... The rule is tolerated ... only because it is recognized that judicial officers in whom discretion is entrusted must be able to exercise discretion vigorously and effectively, without apprehension that they will be subjected to burdensome and vexatious litigation.

*Id.* at 3. *See also Williams v. North*, 685 F.Supp. 502, 504–07 (D.Md.1988), and cases cited therein.

Quasi-judicial officers also have been accorded absolute immunity under certain circumstances. *See Arebaugh v. Dalton*, 600 F.Supp. 1345, 1349 (E.D.Va.1985) (state governor performed judicial function in extradition process); *Ashbrook v. Hoffman*, 617 F.2d 474 (7th Cir.1980) (commissioners appointed by court to conduct a partition sale of property held entitled to quasi-judicial absolute immunity); *Walden v. Wishengrad*, 745 F.2d 149 (2d Cir.1984) (attorney for Department of Social Services who

---

7. In his dissent in *Great American Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1975), Justice White noted that the Third Circuit had correctly assumed that section 1985(3) is applicable to sex discrimination. 442 U.S. at 389 n. 6, 99 S.Ct. at 2357 n. 6.

initiated and prosecuted child protective orders granted immunity). In *Walden,* the Second Circuit wrote:

> We recognize that absolute immunity should be accorded only in exceptional cases.... The rationale underlying the need for absolute immunity must be closely scrutinized before the Court will hold that a government official is protected from liability by an impenetrable shield.

*Id.* at 152 (citations omitted).

The determination of whether absolute immunity should be extended rests on an analysis of "functional categories, not on the status of the defendant." *Briscoe v. La Hue,* 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983). In *McCray v. Maryland,* the Fourth Circuit concluded that a state court clerk sued for his alleged negligence in connection with the filing of a state post-conviction relief petition, was not entitled to absolute quasi-judicial immunity. In so holding, Judge Sobeloff wrote:

> [I]n determining whether the protection afforded by the doctrine of absolute immunity is to be expanded to lesser judicial personnel, it is imperative always to bear in mind the reasons underlying the creation of the immunity shield. "The proper approach is to consider the precise function at issue, and to determine whether the officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct." *Carter v. Carlson, supra,* 447 F.2d [358] at 362 [ (D.C.Cir.1971), *rev'd on other grounds,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) ] (Bazelon, C.J.)....
>
> The immunity of "quasi-judicial" officers such as prosecuting attorneys and parole board members derives, not from their formal association with the judicial process, but from the fact that they exercise a discretion similar to that exercised by judges. Like judges, they require the insulation of absolute immunity to assure the courageous exercise of their discretionary duties. Where an official is not called upon to exercise judicial or quasi-judicial discretion, courts have properly refused to extend to him the protection

of absolute judicial immunity, regardless of any apparent relationship of his role to the judicial system. For example, a defense counsel, a court stenographer, and a jailer all have important duties in the judicial process, but none is afforded judicial immunity because none exercises judicial or quasi-judicial discretion which requires the protection of absolute judicial immunity.

456 F.2d at 3–4 (footnotes omitted).

Professionals appointed by a judge to assist the judge in evaluating individuals involved in a lawsuit before the court do perform discretionary functions within the judicial process. For example, in *Meyers v. Morris,* 810 F.2d 1437 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), absolute immunity was accorded to "therapists" and others "appointed to fulfill quasi-judicial responsibilities under court direction," including duties relating to the question of whether certain children had been neglected. *Id.* at 1467. In so doing, Judge Ross wrote: "The absolute immunity which is accorded persons acting as an integral part of the judicial process protects them from having to litigate the manner in which they performed their delegated functions." *Id.* Freeing court-appointed therapists from liability in such instances "protects important public interests.... Psychologists and other experts would be reluctant to accept court appointments if they thereby opened themselves to liability for their actions in this official capacity." *Doe v. Hennepin County,* 623 F.Supp. 982, 986 (D.Minn.1985). Accordingly, court-appointed doctors are generally entitled to the same immunity extended to judges. *See Burkes v. Callion,* 433 F.2d 318, 319 (9th Cir.1970), *cert. denied,* 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971). *See also Bartlett v. Weimer,* 268 F.2d 860, 862 (7th Cir.1959), *cert. denied,* 361 U.S. 938, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960); *Phillips v. Singletary,* 350 F.Supp. 297, 300 (D.S.C.1972); *Bartlett v. Duty,* 174 F.Supp. 94, 97–98 (N.D.Ohio 1959).

■ Drs. Rappeport and Dvoskin and Judge North, the presiding judge in the

state court custody proceedings, have stated in affidavits that Judge North issued an order referring Williams, Joan Turner and their daughter to defendants for an evaluation and report to assist Judge North in deciding the custody issues. Williams has not challenged those affidavits. Nor has Williams submitted or proferred any evidence to suggest that defendants were not acting at all times pursuant to such court order. Accordingly, Drs. Rappeport and Dvoskin are entitled to the protection of absolute immunity and the grant of summary judgment.

## V. *Injunctive Relief*

■ Plaintiff has requested that "defendants be permanently enjoined from violating citizens' civil rights available under 42 U.S.C. § 1983 and § 1985."[8] While Williams correctly argues that immunity does not extend to a claim for injunctive relief, *Pulliam v. Allen*, 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1980–81, 80 L.Ed.2d 565 (1984), in order to be entitled to such relief, a plaintiff must establish that "he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted). While "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96, 94 S.Ct. at 676. In this case, the role of the two defendant doctors concluded when they testified in the custody proceedings in which they were involved before Judge North. Accordingly, injunctive relief may not be appropriately granted in this case.

8. Amended Complaint ¶ 76.

## VI. *Conclusion*

For the reasons stated in this opinion this Court will enter an order granting summary judgment to defendants Rappeport and Dvorskin.