**Jacquelin LYTHGOE, f/k/a Jacquelin Wellman, Appellant,**

v.

**Janet GUINN, Ph.D., Appellee.**

No. S–5696.

Supreme Court of Alaska.

Nov. 25, 1994.

J. Jeffrey Mayhook, Law Offices of J. Jeffrey Mayhook, Anchorage, for appellant.

Timothy A. McKeever and Matthew D. Regan, Faulkner, Banfield, Doogan & Holmes, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

MOORE, Chief Justice.

### INTRODUCTION

In the course of a child custody dispute between Jacqueline Lythgoe, f/k/a Jacqueline Wellman, and Paul Wellman, the superior court appointed Dr. Janet Guinn to act as an independent custody investigator. Subsequent to the preparation of Guinn's evaluation, which was not used by the court, Lythgoe filed suit against Guinn, alleging negligent and intentional torts in the course of her investigation and the preparation of her report. Guinn moved to dismiss, asserting quasi-judicial immunity, a doctrine heretofore unrecognized by this court. The superior court agreed with Guinn and dismissed Lythgoe's claims. We affirm.

### FACTS AND PROCEEDINGS

In early 1992 the superior court Judge Andrews appointed Dr. Janet Guinn as an independent custody investigator in a divorce and custody proceeding involving Jacqueline Lythgoe, her ex-husband Paul Wellman, and their six-year-old son, Cooper. Under the terms of this appointment, the parties were each required to pay half of the costs and fees incurred by the investigator. The court further ordered the parties to fully cooperate with Dr. Guinn's investigation. Dr. Guinn's report recommended that Wellman be given sole custody of the child.

Lythgoe filed a motion requesting that a separate evaluation be performed, which was granted. Judge Andrews also ordered an *in camera* review of files maintained by the State Division of Occupational Licensing pertaining to an investigation of Dr. Guinn "to determine if there are any relevant documents ... relating to Guinn's qualifications or the weight to give her report or testimony." Following this inspection, the court ordered that "all reports and testimony produced by Dr. Guinn be stricken from the record." The court further directed that none of the documents produced by Dr. Guinn be provided to the new custody evaluator.

In October 1992 Lythgoe filed suit against Dr. Guinn, alleging that she performed the custody investigation negligently, willfully and wantonly, that she intentionally or negligently misrepresented statements of third parties in her report, that she failed to conform to the minimum professional standards for licensed psychologists in the State of Alaska, that she violated statutes governing such professionals, and that she breached her fiduciary duties to Lythgoe. In an amended complaint, Lythgoe further alleged that Dr. Guinn acted as an advocate for Wellman, thereby forfeiting any immunity she might have had.

Dr. Guinn responded to the suit by filing a Rule 12(b)(6) motion to dismiss, alleging quasi-judicial and witness immunity. She also moved to stay discovery and any investigation by the Health Care Expert Advisory Panel convened to review the matter, pending the court's ruling on the motion to dismiss. The superior court, Judge Shortell, granted the stay and ultimately granted Dr. Guinn's motion to dismiss, finding that her actions fell within the scope of quasi-judicial immunity. Lythgoe now appeals.

### DISCUSSION

I. *Is Dr. Guinn, a court-appointed custody investigator, protected under the doctrine of absolute quasi-judicial immunity?*

A. *Absolute Judicial Immunity*

It is well-settled that judges are accorded absolute immunity from liability for damages for acts performed in the exercise of their judicial functions. *See Forrester v. White,* 484 U.S. 219, 225, 108 S.Ct. 538, 543, 98 L.Ed.2d 555 (1988); *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967); *Howard v. Drapkin,* 222 Cal.App.3d 843, 271 Cal.Rptr. 893, 896 (1990). This absolute immunity protects even the judge who acts maliciously or corruptly. *Pierson,* 386 U.S. at 555, 87 S.Ct. at 1218; *Howard,* 271 Cal.Rptr. at 897; *Seibel v. Kemble,* 63 Haw. 516, 631 P.2d 173, 177 (1981).

The United States Supreme Court has noted that absolute judicial immunity serves the twin purposes of protecting the finality of

judgments and preserving judicial independence "by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester,* 484 U.S. at 225, 108 S.Ct. at 543 (citing *Bradley v. Fisher,* 80 U.S. 335, 348, 20 L.Ed. 646 (U.S.1871)).

> If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.

*Id.* 484 U.S. at 226–27, 108 S.Ct. at 544 (citations omitted).

The Court has further noted that the broad scope of the immunity is not intended to protect the malicious or corrupt wrongdoer, but instead is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218 (citation omitted); *see also* J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity,* 1980 Duke L.J. 879, 922 (1980) ("Judicial immunity exists not to protect judges but to protect litigants.").

In *Denardo v. Michalski,* 811 P.2d 315 (Alaska 1991), this court recognized the existence of absolute judicial immunity in Alaska. However, we have not yet addressed or recognized the existence of quasi-judicial immunity, under which persons, other than judges, who perform judicial functions are granted immunity coextensive with that accorded judges.

### B. *Quasi–Judicial Immunity Caselaw*

▮ In the instant case, the superior court dismissed Lythgoe's suit, finding that her claims fell within the recognized scope of absolute quasi-judicial immunity. Indeed, with virtual uniformity, courts have granted absolute immunity to persons who perform functions analogous to those performed by Dr. Guinn in the present case.[1]

For example, in *S.T.J. v. P.M.,* 556 So.2d 244 (La.App.1990), a Louisiana appellate court held that psychologists appointed by the court to aid in resolving custody disputes were absolutely immune from liability for the performance of their delegated functions. In reaching this conclusion, the court stated that "appointed psychologists are non-judicial persons fulfilling quasi-judicial functions and are classified as officers of the court with functions intimately related to the judicial process. Hence, ... they are entitled to absolute immunity protecting them from hav-

---

1. *See, e.g., Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227, 1233 (1977) (participants in legal proceedings enjoy absolute judicial immunity); *Seibel v. Kemble,* 63 Haw. 516, 631 P.2d 173, 177 (1981) (psychiatrists appointed by court to render opinion regarding defendant's mental condition accorded absolute judicial immunity; such persons act as "arm of the court" and perform "functions essential to judicial process"); *Delbridge v. Shaeffer,* 238 N.J.Super. 323, 569 A.2d 872, 880–82 (Law Div.1989) (psychologist, adoption resource center, and child placement review board accorded absolute quasi-judicial immunity in case arising out of child custody evaluation); *Bader v. State,* 43 Wash.App. 223, 716 P.2d 925, 927 (1986) (same as *Seibel* ); *see also Moses v. Parwatikar,* 813 F.2d 891, 892 (8th Cir.) (same as *Seibel* ), *cert. denied,* 484 U.S. 832, 108 S.Ct. 108, 98 L.Ed.2d 67 (1987); *Myers v. Morris,* 810 F.2d 1437, 1466–67 (8th Cir.) (court-appointed guardians ad litem, psychological therapists, and social workers granted absolute quasi-judicial immunity for damage claims arising from performance of delegated functions in child sexual abuse in-

vestigation), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984) (in neglect proceeding, guardian ad litem and psychotherapist who examined child protected by absolute immunity); *Williams v. Rappeport,* 699 F.Supp. 501, 507 (D.Md.1988) (court-appointed doctors entitled to same immunity extended to judges), *aff'd sub nom. Williams v. Dvoskin,* 879 F.2d 863 (4th Cir.), *cert. denied,* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989); *Doe v. Hennepin County,* 623 F.Supp. 982, 986–87 (D.Minn.1985) (court-appointed therapists entitled to absolute immunity for acts within scope of appointment); *Wagner v. Genesee County Bd. of Comm'rs,* 607 F.Supp. 1158, 1162–65 (E.D.Mich.1985) ("friend of court," whose duties included making recommendations as to custody in divorce cases, accorded absolute quasi-judicial immunity); *cf. Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1115–16, 75 L.Ed.2d 96 (1983) ("the common law provided absolute immunity from subsequent damages liability for all persons—governmental or otherwise—who were integral parts of the judicial process").

ing to litigate the manner in which they perform those functions." *Id.* at 247.

An Arizona court reached the same result in *Lavit v. Superior Court*, 173 Ariz. 96, 839 P.2d 1141 (App.1992). In *Lavit*, the parties to a marriage dissolution sought to employ a psychologist to conduct a child custody evaluation. The court adopted the parties' stipulation asking that Dr. Lavit be named to fill the position. *Id.* at 1142–43. The court eventually incorporated Dr. Lavit's recommendations into its dissolution decree. *Id.* at 1143. Subsequently, however, the father sued Dr. Lavit, alleging that his evaluation was improperly biased in favor of the child's mother. *Id.*

The appeals court granted summary judgment in favor of Dr. Lavit, holding that "[j]udicial immunity protects a non-judicial officer performing a function pursuant to a court directive related to the judicial process." *Id.* at 1144. In reaching this conclusion, the court stated that "[t]he question becomes not how the psychologist was first chosen but whether his activity is an integral part of the judicial process so that to deny immunity would disserve the broader public interest that non-judicial officers act without fear of liability." *Id.; see also LaLonde v. Eissner*, 405 Mass. 207, 539 N.E.2d 538, 541 (1989) ("common law immunity protects persons appointed by a court to conduct medical or psychiatric evaluation and render an opinion or to provide other expert assistance because of their integral relation to the judicial process").

The superior court relied principally on *Howard v. Drapkin*, 222 Cal.App.3d 843, 271 Cal.Rptr. 893 (1990), in finding that Lythgoe's claims were precluded by quasi-judicial immunity. As in the cases discussed above, the *Howard* court held that a psychologist engaged by the court to evaluate the parties to a custody dispute is entitled to the protection of absolute quasi-judicial immunity. *Id.*, 271 Cal.Rptr. at 894.

In *Howard*, the parties to a child custody dispute agreed to hire a licensed psychologist to conduct an independent custody evaluation. As in *Lavit*, the parties' stipulation regarding the appointment was approved by the trial court and converted into an order.

*Id.* Following the preparation of the evaluation report, the mother sued the psychologist, alleging professional negligence, negligent and intentional infliction of emotional distress, and fraud. *Id.* at 894–95. The trial court dismissed the claims. *Id.* at 896.

The court of appeals affirmed the dismissal, noting that quasi-judicial immunity applied

> to people connected with the judicial process ... such as (1) mediators, guardians ad litem, therapists, receivers, bankruptcy trustees and other persons appointed by the courts for their expertise and (2) persons whose work product comes into the judicial process to be used by the court even though they were not court-appointed, such as social workers and probation department employees.

*Id.* at 899.

The court further noted that the psychologist performed a function "intimately related to the judicial process" and which involved "impartiality and neutrality." *Id.* at 901–902. Thus, the court concluded that "there should be entitlement to the same immunity given others who function as neutrals in an attempt to resolve disputes," such as judges, commissioners and referees. *Id.* at 902. Based on this analysis, the court held that

> quasi-judicial immunity is properly extended to these neutral third-parties for their conduct in performing dispute resolution services which are connected to the judicial process and involve either (1) the making of binding decisions, (2) the making of findings or recommendations to the court or (3) the arbitration, mediation, conciliation, evaluation or other similar resolution of pending disputes.

*Id.* at 903.

In the present case, Dr. Guinn was appointed by the superior court to provide professional advice and expertise regarding the custody of Lythgoe's child. Lythgoe's allegations stem directly from Dr. Guinn's role in the custody proceeding. In acting pursuant to her court-appointment, Dr. Guinn served as an "arm of the court" and performed a function "integral to the judicial process." *See Seibel*, 631 P.2d at 179. Thus, we con-

clude that the trial court did not err in granting Dr. Guinn absolute quasi-judicial immunity.

### C. *Public Policy Considerations*

The superior court's determination that Dr. Guinn was protected by quasi-judicial immunity is also well-supported by policy considerations. In *Lavit*, the court identified several grounds supporting absolute judicial immunity:

> (1) the need to save judicial time in defending suits; (2) the need for finality in the resolution of disputes; (3) to prevent deterring competent persons from taking office; (4) to prevent the threat of lawsuit from discouraging independent action; and (5) the existence of adequate procedural safeguards such as change of venue and appellate review.

*Lavit*, 839 P.2d at 1144 (citing *Grimm v. Arizona Bd. of Pardons & Paroles*, 115 Ariz. 260, 564 P.2d 1227, 1231–31 (1977)); *see also Seibel*, 631 P.2d at 178 (noting "the unfairness of requiring an opinion and the exercise of judgment to which is given special deference and then subjecting that person to liability based on the opinion of another"). The *Lavit* court further noted that "[t]hese policy reasons apply equally to court-appointed officials such as psychologists and psychiatrists who assist the court in making decisions." *Lavit*, 839 P.2d at 1144; *see also Seibel*, 631 P.2d at 178 ("The reasons underlying judicial immunity . . . apply equally to court-appointed officials.").

In extending absolute judicial immunity to quasi-judicial officers such as court-appointed psychotherapists, most courts have relied in particular on the fear that "[e]xposure to liability could deter their acceptance of court appointments or color their recommendations." *Lavit*, 839 P.2d at 1144. For example, in *Seibel*, the court noted that "failure to extend absolute immunity to [court-appointed

psychiatrists] would produce a chilling effect upon acceptances of future court appointments." *Seibel*, 631 P.2d at 180; *see also, e.g., LaLonde*, 539 N.E.2d at 541 ("[p]sychologists and other experts would be reluctant to accept court appointments if they thereby opened themselves to liability for their actions in this official capacity") (citation omitted).

Similarly, courts have consistently recognized that the threat of civil liability may affect the manner in which such court-appointed experts perform their jobs. In *Antoine v. Byers & Anderson, Inc.*, the United States Supreme Court stated that "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, '*exercise a discretionary judgment*' as part of their function." —— U.S. ——, ——, 113 S.Ct. 2167, 2171, 124 L.Ed.2d 391 (1993) (emphasis added) (citation omitted). Certainly, it is undeniable that a psychotherapist appointed by the court to conduct a child custody investigation exercises discretionary judgment in rendering an evaluation.[2] *See Williams v. Rappeport*, 699 F.Supp. 501, 507 (D.Md.1988) ("Professionals appointed by a judge to assist . . . in evaluating individuals involved in a lawsuit before the court do perform discretionary functions within the judicial process."), *aff'd sub nom. Williams v. Dvoskin*, 879 F.2d 863 (4th Cir.), *cert. denied*, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989).

The sine qua non of the exercise of such discretion is the freedom to act in an objective and independent manner. Recognizing this concern, the *Williams* court stated that "[t]he proper approach is to consider the precise function at issue, and to determine whether the officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious con-

---

**2.** *Compare Levine v. Wiss & Co.*, 97 N.J. 242, 478 A.2d 397 (1984), the only case cited by Lythgoe in which a court-appointed expert was denied absolute immunity. In *Levine*, the court appointed an accountant to render a binding valuation of an asset in dispute. One of the parties sued the accountant, alleging that the accountant was negligent in valuing the asset. *Id.*, 478 A.2d at

398. The court refused to grant the accountant quasi-judicial immunity on the grounds that he "did not resolve any conflicting claims or determine legal rights and obligations. [He] did not exercise *the discretionary judgment* that is the hallmark of [judicial officers'] function." *Id.* at 402 (emphasis added).

duct." *Id.* (quoting *McCray v. Maryland,* 456 F.2d 1, 3–4 (4th Cir.1972)).

This danger is clearly present in the context of the court-appointed professional. As the court noted in *LaLonde,* "human nature indicates that court-appointed experts, faced with the threat of personal liability, will be less likely to offer the disinterested objective opinion that the court seeks." *LaLonde,* 539 N.E.2d at 541; *see also Howard,* 271 Cal. Rptr. at 897 ("to submit all officials ... to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties") (citation omitted); *Williams,* 699 F.Supp. at 507 (quasi-judicial officers, "[l]ike judges, ... require the insulation of absolute immunity to assure the courageous exercise of their discretionary duties"). Thus, the extension of absolute judicial immunity to quasi-judicial officers such as court-appointed psychotherapists is a proper recognition of the "possibility that a professional who is delegated judicial duties to aid the court will become a 'lightning rod for harassing litigation.'" *Lavit,* 839 P.2d at 1144 (quoting *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno,* 547 F.2d 1, 3 (1st Cir.1976)).[3]

### D. *Lythgoe's Arguments*

Lythgoe offers several arguments, each of which we find unpersuasive, in support of her assertion that Dr. Guinn should not have been accorded absolute immunity. First, she argues that Guinn was entitled to only qualified, not absolute immunity.[4] In advancing this argument, she relies exclusively on this court's decision in *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150 (Alaska 1987). In *Aspen,* a case involving a suit against the governor, the court adopted a multi-factor case-specific test to determine whether a *public official* is protected by absolute or qualified immunity. *Id.* at 159–60.

In the present case, the superior court dismissed Lythgoe's argument, concluding that official immunity "serves entirely different ends" than does judicial immunity. Indeed, in *Grimm,* the Arizona Supreme Court stated that "[i]t is clear that the policy reasons for official immunity are much weaker than for judicial immunity." 564 P.2d at 1232. In particular, the court noted that the concerns regarding the finality of disputes and the saving of judicial time are far less compelling outside of the judicial context. *Id.* The court also noted that procedural safeguards, while present in the judicial setting, are "often totally lacking" in the administrative context. *Id.* Based on these findings, the Arizona court held that "absolute immunity for public officials in their discretionary functions *acting in other than true judicial proceedings* is ... improper." *Id.* (emphasis added).

3. The policy concerns supporting quasi-judicial immunity are, if anything, more pronounced in the context of child custody proceedings. In *Lavit,* the court recognized that "[c]hild custody determinations require an insight into family dynamics, the psychosocial needs of the child, and the abilities of each parent." 839 P.2d at 1146. Such insight generally falls outside of a judge's expertise. Likewise, time constraints prevent a judge from personally being able to investigate adequately all of the factors relevant to the complex child custody determination. As the superior court noted in the present case, a psychologist appointed to assist the court in making a custody finding "is essentially an extension of the judge, and performs the same investigatory process the judge would if he or she had the time and education to do the job on his or her own." In addition, the state's compelling interest in protecting and preserving the well-being of children requires that such experts "be able to perform their jobs 'without the worry of intimidation and harassment from dissatisfied parents.'" *Howard,* 271 Cal.Rptr. at 900 (quoting *Kurzawa v.*

*Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984)); *see also In re D.D.S.,* 869 P.2d 160, 163 (Alaska 1994) (discussing State's compelling interest in protecting children).

4. Under the doctrine of qualified immunity, a party is shielded from liability only for actions done in good faith and that are not malicious or corrupt. *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 158 (Alaska 1987). One commentator, in discussing qualified immunity for judicial officers, states:

The chief drawback to this proposal is that most aggrieved litigants would readily allege that a judge's conduct had been malicious, or had met any other requisite standard, and the truth of such allegations could not be determined without a trial; the damage to the policies supporting immunity would be inflicted by the fact of a trial, no matter what the verdict. J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity,* 1980 Duke L.J. 879, 922 (1980).

The Supreme Court has noted an additional rationale underlying the distinction between absolute judicial immunity and qualified executive or public official immunity. In *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), the Court recognized that

> the nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have.... [T]his is the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided.

*Id.* at 226, 108 S.Ct. at 544. The concerns expressed in *Forrester* certainly apply in the emotional and often inflammatory divorce and child custody context. Thus, the superior court was correct in concluding that *Aspen*'s analysis of public official immunity is inapposite to the present case.

Lythgoe also argues that granting Dr. Guinn absolute immunity violates public policy in that it fails to provide her with an adequate remedy or safeguard from Dr. Guinn's alleged misconduct. She asserts that "the Superior Court's expansion of absolute immunity here gives Guinn ... greater license to perform her work in whatever manner she deems appropriate—without regard to professional standards and without fear of being held accountable for her tortious misconduct."

On the contrary, several courts have noted that adequate remedies and safeguards, other than civil liability, exist to hold court-appointed experts accountable for their actions. For example, in *LaLonde*, the court stated that "[w]hile we are cognizant of the need to prevent negligently performed evaluations, our judicial system has inherent safeguards that minimize the risk of decisions based on inaccurate, misleading, or negligently conducted evaluations." *LaLonde*, 539 N.E.2d at 542. In particular, the court noted that, where the expert testifies or the expert's report is presented to the court, the complaining party has the opportunity to examine the expert and bring to the judge's attention any alleged deficiencies in the evaluation. In addition, the court further noted that the complaining party is "free to seek appellate review or ... request a modification of the [trial court's] order." *Id.; see also* Casenote, *Absolute Immunity for the Negligent Expert Witness: Bruce v. Byrne–Stevens*, 26 Willamette L.Rev. 1051, 1076 (1990) (noting remedies of appellate review and opportunity for cross-examination).

Similarly, in *Seibel*, the court noted additional safeguards against tortious conduct by a court-appointed expert:

> Although appellees would not be civilly liable for the consequences of their alleged negligent acts, the court is able to insure that its agents will be accountable for their conduct and actions. The court, in its discretion, has the authority to impose or recommend that numerous sanctions be imposed for negligent conduct. Some of the sanctions that could be imposed include appointing another doctor to serve on the panel, prohibiting the doctor from further service to the court and reporting that doctor's behavior to the medical boards for further action.

*Seibel*, 631 P.2d at 177 n. 8.

In the present case, Lythgoe successfully availed herself of such alternative remedies. She deposed Dr. Guinn and presented her objections to the trial court, which issued an order that Dr. Guinn's report be stricken from the record. She additionally would have had the opportunity to seek appellate review had the trial court denied her motion to exclude Dr. Guinn's report. These alternative mechanisms for review are "largely free of the harmful side-effects inevitably associated with exposing judges [and quasi-judicial officers] to personal liability." *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544. Thus, Lythgoe's public policy argument is unpersuasive.

Lythgoe also argues that Dr. Guinn abandoned her neutral role and assumed the role of an advocate for Wellman, thereby waiving any immunity to which Guinn was entitled. In advancing this argument, Lythgoe relies on two cases, both of which are inapposite to the instant case. In *Collins ex rel. Collins v. Tabet*, 111 N.M. 391, 806 P.2d 40 (1991), and

*Barr v. Day,* 69 Wash.App. 833, 854 P.2d 642 (1993), the courts held that where a guardian ad litem acts as a *private advocate* for his or her ward, as opposed to a functionary of the court, he or she is not immune from suit brought by the ward for malpractice. *Collins,* 806 P.2d at 44; *Barr,* 854 P.2d at 649–50.

In reaching this conclusion, the *Collins* court stated:

> Where the guardian ad litem is acting as an advocate for his client's position—representing the pecuniary interest of the *child* instead of looking into the fairness of the settlement . . . on behalf of the *court*—the basic reason for conferring quasi-judicial immunity on the guardian does not exist. In that situation, he or she functions in the same way as does any other attorney for a client—advancing the interests of the client, not discharging (or assisting in the discharge of) the duties of the court.

*Collins,* 806 P.2d at 48. The court further held, however, that where the guardian acts as an "arm of the court," absolute immunity is proper, noting that the "objectivity of a guardian's investigation and recommendation might be compromised by the threat of liability; and . . . this could impair the judge's own ability to perform his or her judicial duties." *Id.* at 47–48.

In the present case, all of Lythgoe's allegations arise from Dr. Guinn's role as a court-appointed custody investigator. Unlike the guardian ad litem/ward relationship, it cannot be argued that a court-appointed expert acts "in the same way as does [an] attorney for a client." *Id.* at 48; *see Howard,* 271 Cal.Rptr. at 902 (psychologist mediating custody dispute "is not an advocate for either parent").

To accept Lythgoe's argument would render quasi-judicial immunity meaningless and defeat the purposes underlying the doctrine, as it would open the door to allegations of waiver by advocacy in every case where the quasi-judicial officer makes a recommendation contrary to a party's position. In this case, the superior court found that Lythgoe's proposed amendment to her complaint, which added the allegation of advocacy, was "based on the same factual occurrences set forth in her original complaint." We agree with this conclusion and find her waiver argument unpersuasive.[5]

■ Finally, Lythgoe argues that absolute immunity is improper in the present case, because the superior court did not rely on Dr. Guinn's report in resolving the custody issue. Lythgoe relies on *Lavit,* 173 Ariz. 96, 839 P.2d 1141, in advancing this argument. In *Lavit,* the court held that a psychologist was absolutely immune from liability in an action arising from a custody evaluation. *Id.* 839 P.2d at 1146. In so holding, the court stated that the psychologist's "activities are protected because (1) *at least to some extent, his evaluations and recommendations aided the trial court in determining child custody,* and (2) his services were performed pursuant to a court order." *Id.* (Emphasis added).

*Lavit* appears to stand alone in suggesting that actual assistance to the trial court is a prerequisite to the granting of quasi-judicial immunity. For example, both *Howard* and *Seibel* expressly note that absolute quasi-judicial immunity is appropriate where the findings and opinions of the quasi-judicial officer are not binding and where the final determination rests solely with the court. *Howard,* 271 Cal.Rptr. at 902–03; *Seibel,* 631 P.2d at 180.

In any event, to the extent *Lavit* may be interpreted to require actual reliance in the present case, we find that it is bad law. As discussed above, the central policy consideration supporting the doctrine of absolute quasi-judicial immunity for court-appointed

---

**5.** In *Denardo,* we held that a judge is only liable "if his actions were 1) not 'judicial,' or 2) outside of his subject matter jurisdiction." 811 P.2d at 316. As noted above, Lythgoe's allegations are clearly based on actions, judicial in nature, performed by Dr. Guinn within the scope of her court-appointment as a custody investigator. Thus, we need not address the existence or breadth of quasi-judicial immunity in the situation where the court-appointed expert has wholly abandoned his or her role as a functionary of the court. For example, we express no opinion as to whether civil liability will lie where an expert accepts a bribe or otherwise engages in criminal conduct.

experts is the fear that "[e]xposure to liability could deter their acceptance of court appointments or color their recommendations." *Lavit,* 839 P.2d at 1144. The rule suggested by Lythgoe would do injury to this concern.

Undoubtedly, potential civil liability would discourage qualified professionals from accepting court appointments, even if such liability arose only where the court disregarded the experts' recommendations. In addition, exercise of the experts' independent judgment would be impaired, as they would have an incentive to make recommendations that are more likely to be adopted by the court. Also, the *Seibel* court recognized an additional danger inherent in limiting immunity to those situations of actual reliance: "a fear of bringing down litigation on the [court-appointee] might color a court's judgment in some cases, and if the court ignores the danger of harassing suits, tensions between [appointee] and judge seem inevitable." *Seibel,* 631 P.2d at 180 (quoting *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno,* 547 F.2d 1, 3

(1st Cir.1976)). Finally, such a rule would place a court in the awkward position of determining the factors which guided a co-equal court's decision. In light of these concerns, we find unpersuasive Lythgoe's argument that actual reliance be required.[6]

CONCLUSION

Based on the above analysis, we affirm the superior court's dismissal of Lythgoe's complaint. Caselaw and policy considerations clearly support the granting of absolute quasi-judicial immunity to Dr. Guinn, a psychologist/child custody investigator appointed by the court to assist in its custody determination.[7]

AFFIRMED.

---

**6.** Lythgoe also repeatedly notes throughout her brief that the parties each paid one half of Dr. Guinn's expenses. This is irrelevant to the quasi-judicial immunity issue, as courts have uniformly held that the determinative question is not how the court-appointed expert is selected or paid, but whether his or her "activity is an integral part of the judicial process." *Lavit,* 839 P.2d at 1144; *see LaLonde,* 539 N.E.2d at 542 n. 9 ("the fact that the Probate Court ordered [the plaintiff] to be responsible for the cost of [the court-appointee's] services does not affect [the appointee's] status as a quasi-judicial officer entitled to immunity"); *Howard,* 222 Cal.App.3d 843, 271

Cal.Rptr. 893 (granting absolute judicial immunity to privately hired and paid neutral psychologist).

**7.** Guinn also argues that she should be granted absolute testimonial witness immunity. The superior court did not address this issue, instead relying on the doctrine of quasi-judicial immunity. Since our holding that Guinn is protected by absolute quasi-judicial immunity is dispositive, we decline to address the witness immunity issues.