TYRONE G. DUFF, Appellant, *v.* RICHARD W. LEWIS, Respondent.

No. 29581

May 19, 1998                                958 P.2d 82

[Rehearing denied August 4, 1998]

*Martin G. Crowley*, Reno; *Stafford Frey & Cooper* and *Marcus Nash*, Seattle, Washington, for Appellant.

*Jones Vargas and Albert F. Pagni* and *Eric W. Lerude*, Reno, for Respondent.

## OPINION

*Per Curiam:*

Appellant Tyrone G. Duff ("Duff") and his ex-wife, Yolanda Foster ("Yolanda"), have been divorced since December 1988. Per their marital settlement, Yolanda received custody of their two sons, Cameron and Aaron. At the time of the divorce, Cameron and Aaron were six and three years old, respectively. The district court gave Duff visitation rights.

Yolanda remarried to William Foster ("William") in 1989.

William is a five-time felon,[1] with a history of violent behavior and alleged sexual assault.

In May 1990, during a visitation, Duff purportedly noticed inappropriate sexual behavior by the two children. Duff arranged for Cameron and Aaron to be evaluated by a marriage and family therapist. The therapist opined that the children had been sexually abused and reported the matter to the Washoe County Department of Social Services ("Social Services"). Social Services contacted the Reno Police Department, which then began an investigation in conjunction with the Washoe County Sexual Abuse Investigation Team ("SAINTS").

On November 15, 1990, pursuant to a motion from Duff, the district court entered a protective order, awarding temporary physical custody of the children to Duff. On December 20, 1990, while the investigation was pending, Duff filed a motion to modify the decree of divorce, requesting permanent custody of Cameron and Aaron.

The SAINTS' investigation results indicated that the boys showed behavioral and physical signs of sexual molestation. On February 8, 1991, based on the findings of the SAINTS' investigation, the district court master reported that Cameron and Aaron had, by a preponderance of the evidence, been victims of sexual molestation and that William was "more likely than not" the perpetrator. The court master recommended that Cameron and Aaron remain with Duff pending the outcome of the police investigation.

On June 5, 1991, based on the court master's recommendation, the district court renewed the temporary custody of the children to Duff, granted strictly supervised visitation of the children to Yolanda, and prohibited any contact whatsoever between William and the children. The order was to remain in effect for one year or the time of the final outcome of the police investigation, whichever came first.

On July 12, 1991, after a motion to reconsider from William and Yolanda, the district court entered an order amending the order of June 5, 1991. By this second order, Yolanda was granted physical custody of the children every other weekend. However, William was still prohibited from having any contact at all with the children, or being any closer than five hundred yards from where the children may be. The protective order was to be in effect until February 1992.

In October 1991, the Reno Police Department closed the investigation, and the Washoe County District Attorney's Office refused to proceed with a criminal complaint.

---

[1]William's convictions include attempted homicide, aggravated assault, battery causing substantial bodily harm, and two drug offenses.

On April 21, 1993, in connection with the custody proceeding, the district court appointed respondent Richard W. Lewis ("Lewis") to perform psychological assessments on the children. The assessments included testing, scoring, and evaluation of test results as well as clinical interviews and observations of Duff and Yolanda. In its order, the district court stated that Lewis was "free to follow any procedure he deems appropriate and is free to contact [Duff, Yolanda, William, Cameron, and Aaron] to obtain such information as he deems appropriate to aid in his evaluation." The district court further stated that Duff, Yolanda, and William were restrained from contacting Lewis concerning the case. This restriction also applied to any agent of the parties, "including any person who may have been retained by the parties to provide counseling and/or therapy to the minor children, any prior independent therapist and/or any other person having had previous contact on a professional basis with the children or the parties." Lewis' fees were to be jointly paid by Duff and Yolanda.

In the course of his evaluation, Lewis evaluated Duff, Yolanda, and the children. On July 6, 1993, while testifying at the children's custody hearing, Lewis recommended that Duff temporarily lose custody of the children as well as his right to visitation. Lewis also recommended that the children be placed in the custody of Yolanda and William.

On July 26, 1993, the district court adopted Lewis' recommendations in its findings of fact and conclusions of law. The district court found that Duff suffered from mixed personality disorder with many narcissistic and paranoid personality characteristics. The district court also found that Duff was physically and economically impaired as a result of stress and his substantial intake of prescription medications. The district court further found that Duff's testimony was unreliable and motivated by "a rage" against Yolanda and William, and that "in spite of [William's] criminal record, there is no evidence that he ever perpetrated any child abuse or that he fit the profile of a pedophile." The district court restored permanent physical custody of the children to Yolanda and directed Lewis to monitor the progress of Duff's psychotherapy.

Duff complained about Lewis to the Nevada State Board of Psychological Examiners (the "Board"). Pursuant to Duff's complaint, the Board conducted an investigation into Lewis' handling of the custody proceeding. On May 20, 1995, a hearing was held before the Board. On July 20, 1995, the Board entered its findings of fact and conclusions of law. The Board stated that Lewis' evaluation of Duff was deficient for the following reasons: (1) Lewis did not inform the district court how Duff's medications might affect his performance on the psychological tests; (2) Lewis' selective reporting of psychological findings left the

impression that Duff was of substandard intelligence; and (3) Lewis failed to avoid misleading the district court when he did not explain that Duff fell within the average range of intellectual functioning. Accordingly, the Board ordered that Lewis be issued a private letter of reprimand and that he pay $4,000.00 for the cost of the disciplinary proceedings.

On July 21, 1995, the following day, Duff filed a complaint against Lewis, seeking damages for Lewis' alleged negligence. On September 1, 1995, Duff filed an amended complaint in which he incorporated the Board's findings and alleged that he was denied custody and forced to seek psychological care as a result of Lewis' professional negligence.

On July 19, 1996, Lewis filed a motion for judgment on the pleadings, pursuant to NRCP 12(c). On August 1, 1996, Duff filed his opposition to Lewis' motion. On October 30, 1996, the district court granted Lewis' motion for judgment on the pleadings, concluding that Lewis enjoyed quasi-judicial immunity.

On November 18, 1996, Duff filed his notice of appeal.

## DISCUSSION

Duff argues that the district court erred in granting Lewis' motion for judgment on the pleadings. Lewis counters that even if Duff's factual allegations are true, Duff's claim cannot stand as a matter of law because Lewis is protected by quasi-judicial immunity. This court has not previously addressed the issue of whether court-appointed professionals assisting the judge in evaluating individuals involved in a legal action are entitled to absolute quasi-judicial immunity.

It is well established that a motion under NRCP 12(c) "is designed to provide a means of disposing of cases when material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings." Bernard v. Rockhill Dev. Co., 103 Nev. 132, 135, 734 P.2d 1238, 1241 (1987). "Moreover, a defendant will not succeed on a motion under Rule 12(c) if there are allegations in the plaintiff's pleadings that, if proved, would permit recovery." Id. at 136, 734 P.2d at 1241. A motion under this rule "has utility only when all material allegations of fact are admitted in the pleadings and only questions of law remain." Id. Whether quasi-judicial immunity exists for a court-appointed psychologist is a question of law. See Lavit v. Superior Court, 839 P.2d 1141, 1144 (Ariz. Ct. App. 1992).

The common law doctrine of absolute immunity extends to all persons who are an integral part of the judicial process. See Briscoe v. LaHue, 460 U.S. 325, 335 (1983). The purpose

behind a grant of absolute immunity is to preserve the independent decision-making and truthfulness of critical judicial participants without subjecting them to the fear and apprehension that may result from a threat of personal liability. *See* Imbler v. Pachtman, 424 U.S. 409, 422-24 (1976). "Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." Butz v. Economou, 438 U.S. 478, 512 (1978). Additional reasons for allowing absolute judicial immunity include: "(1) the need to save judicial time in defending suits; (2) the need for finality in the resolution of disputes; (3) to prevent deterring competent persons from taking office; (4) to prevent the threat of lawsuit from discouraging independent action; and (5) the existence of adequate procedural safeguards such as change of venue and appellate review." *Lavit*, 839 P.2d at 1144 (citing Grimm v. Arizona Bd. of Pardons & Paroles, 564 P.2d 1227, 1231-32 (Ariz. 1977)).

> These policy reasons apply equally to court-appointed officials such as psychologists and psychiatrists who assist the court in making decisions. Without immunity, these professionals risk exposure to lawsuits whenever they perform quasi-judicial duties. Exposure to liability could deter their acceptance of court appointments or color their recommendations.

*Id.* (citing Seibel v. Kemble, 631 P.2d 173, 180 (Haw. 1981)). Indeed, "[i]mmunity removes the possibility that a professional who is delegated judicial duties to aid the court will become a 'lightning rod for harassing litigation.' " *Id.* (quoting Acevedo v. Pima County Adult Probation Dept., 690 P.2d 38, 40 (Ariz. 1984)).

Like the case at bar, *Lavit* involved an underlying child custody dispute. Pursuant to a recommendation from the wife's attorney, both the husband and the wife entered a written stipulation to contact a psychologist to assist in resolving a child custody dispute. *Id.* at 1142. After evaluating all the parties, the psychologist recommended that the wife be awarded custody. The district court adopted the stipulation, incorporated the psychologist's recommendations into the dissolution decree, and awarded custody to the wife. *Id.* at 1143. The husband then sued the psychologist for alleged negligent evaluation. The psychologist moved for summary judgment on the grounds of quasi-judicial immunity. The district court denied his motion for summary judgment, and the psychologist filed an interlocutory appeal. *Id.* at 1142. The Arizona Court of Appeals reversed, holding that the psychologist was "entitled to absolute immunity for his role in the child custody determination. His activities [were] protected because (1) at least to some extent, his evaluations and recommendations

aided the trial court in determining child custody, and (2) his services were performed pursuant to a court order." *Id.* at 1146 (footnote omitted).

In Lythgoe v. Guinn, 884 P.2d 1085, 1086 (Alaska 1994), a court-appointed psychologist was sued for negligence by a parent who lost a custody dispute. Under the terms of the order appointing the psychologist, the parties were to share the psychologist's costs and fees. After evaluating the parties, the psychologist recommended that the husband receive custody of the child. The psychologist's report was subsequently stricken after an *in camera* review of her qualifications and the credibility of her testimony. The wife sued the psychologist for, *inter alia,* negligent investigation, misrepresentation of statements made by third parties, and failure to perform to the state's minimum professional standards for psychologists. The trial court granted the psychologist's motion to dismiss for failure to state a claim upon which relief may be granted, finding that the psychologist's "actions fell within the scope of quasi-judicial immunity." *Id.* The Supreme Court of Alaska affirmed the trial court's decision, holding that the psychologist "served as an 'arm of the court' and performed a function 'integral to the judicial process.' " *Id.* at 1088 (quoting *Seibel,* 631 P.2d at 179).

There is no material factual distinction between *Lythgoe* and the present case. Here, the district court expressly appointed Lewis to assist in the custody determination by evaluating the children, following any procedure he deemed appropriate, and contacting any party whom he felt necessary. Lewis did so. As in *Lythgoe,* Duff and Yolanda split the responsibility for paying Lewis' fees. Lewis, even in light of his reprimand by the Board, was serving as "an arm of the court" and "performed a function integral to the judicial process." *See Lythgoe,* 884 P.2d at 1088. Further, it has been held that "[t]he psychologist who is mediating a child custody dispute, whether by court appointment or not, is not an advocate for either parent, even if paid by them." Howard v. Drapkin, 271 Cal. Rptr. 893, 902 (Ct. App. 1990).

The court-appointed psychologist performs a valuable and integral function in assisting courts in evaluating cases such as the one now before us. We recognize that "[t]he sine qua non of the exercise of [the court-appointed professional's discretion] is the freedom to act in an objective and independent manner." *Lythgoe,* 884 P.2d at 1089. "Exposure to liability could deter their acceptance of court appointments or color their recommendations." *Lavit,* 839 P.2d at 1444. Indeed, such exposure could "produce a chilling effect upon acceptances of future court appointments." *Seibel,* 631 P.2d at 180.

Moreover, there are adequate procedural remedies and safe-

guards that hold court-appointed professionals accountable for their actions. First, and most obvious, is the adversarial process of cross-examination and the opportunity "to bring to the judge's attention any alleged deficiencies in the evaluation." *Lythgoe,* 884 P.2d at 1091. Second, "the complaining party is 'free to seek appellate review or . . . request a modification of the [trial court's] order.' " *Id.* (quoting LaLonde v. Eissner, 539 N.E.2d 538, 542 (Mass. 1989)). Third,

> "[a]lthough appellees would not be civilly liable for the consequences of their alleged negligent acts, the court is able to insure that its agents will be accountable for their conduct and actions. The court, in its discretion, has the authority to impose or recommend that numerous sanctions be imposed for negligent conduct. Some of the sanctions that could be imposed include appointing another doctor to serve on the panel, prohibiting the doctor from further service to the court and reporting that doctor's behavior to the medical boards for further action."

*Id.* (quoting *Seibel,* 631 P.2d at 177 n.8.).

Therefore, we hold that Lewis is entitled to absolute quasi-judicial immunity from Duff's suit because "(1) at least to some extent, his evaluations and recommendations aided the trial court in determining child custody, and (2) his services were performed pursuant to a court order."[2,3] *Lavit,* 839 P.2d at 1146 (footnote omitted).

Accordingly, we affirm the order of the district court.

---

[2]Although this is the first time we have addressed this issue, other jurisdictions have overwhelmingly granted quasi-judicial immunity to persons performing duties similar to Lewis'. *See, e.g.,* Williams v. Rappeport, 699 F. Supp. 501 (D. Md. 1988), *aff'd,* 879 F.2d 863 (4th Cir.), *cert. denied,* 493 U.S. 894 (1989) (court-appointed psychologist and psychiatrist in custody action); Bartlett v. Weimer, 268 F.2d 860 (7th Cir. 1959), *cert. denied,* 361 U.S. 938 (1960) (court-appointed physicians in evaluating a person's mental condition); Moses v. Parwatikar, 813 F.2d 891 (8th Cir.), *cert. denied,* 484 U.S. 832 (1987) (same as *Bartlett*); Myers v. Morris, 810 F.2d 1437 (8th Cir.), *cert. denied,* 484 U.S. 828 (1987) (therapists in child sexual abuse case); Burkes v. Callion, 433 F.2d 318 (9th Cir. 1970) (same as *Bartlett*); Doe v. Hennepin County, 623 F. Supp 982 (D. Minn. 1985) (psychologist selected by parents to assist court in custody action); *Howard,* 271 Cal. Rptr. 893 (psychologist selected and paid by parents to assist court in child custody dispute); *Seibel,* 631 P.2d 173 (court-appointed psychiatrist in custody action); *LaLonde,* 539 N.E.2d 538 (same as *Seibel*); Linder v. Foster, 295 N.W. 299 (Minn. 1940) (same as *Bartlett*); Delcourt v. Silverman, 919 S.W.2d 777 (Tex. App. 1996), *cert. denied,* 520 U.S. 1213, 117 S. Ct. 1698 (1997) (same as *Seibel*).

[3]Lewis also argues that no doctor-patient relationship existed and, as such, he owed no duty of care to Duff. However, our holding on the issue of quasi-judicial immunity is dispositive, and therefore, we decline to address this issue.