THE STATE OF NEVADA; EDWARD PAIGE, NANCY GAMMIE, AND ARNOLD SIERRA, INDIVIDUALLY AND AS AGENTS AND EMPLOYEES OF THE STATE OF NEVADA; COLLETTE LANCASTER AND SCOTT LANCASTER, INDIVIDUALLY AND AS LICENSED FOSTER PARENTS OF AZERIA DUCHARM; MONTY LOPER AND SHALA LOPER, INDIVIDUALLY AND AS PARENTS OF A TEENAGE DAUGHTER, JAIME BEESLEY, JOINTLY AND SEVERALLY; JOHN BROWN AND JANE BROWN, INDIVIDUALS, PETITIONERS, v. THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF WASHOE, AND THE HONORABLE STEVEN R. KOSACH, DISTRICT JUDGE, RESPONDENTS, AND AZERIA DUCHARM, A MINOR CHILD NOW DECEASED; ESTATE OF AZERIA DUCHARM; AND MONIQUE DUCHARM, INDIVIDUALLY AND AS THE NATURAL MOTHER, HEIR AND THE LEGAL REPRESENTATIVE OF THE ESTATE OF AZERIA DUCHARM, REAL PARTIES IN INTEREST.

No. 38543

October 16, 2002                                            55 P.3d 420

[Rehearing denied January 30, 2003]

*Frankie Sue Del Papa,* Attorney General, and *Charles Hilsabeck,* Deputy Attorney General, Carson City, for Petitioners State of Nevada, Edward Paige, Nancy Gammie, and Arnold Sierra.

*Laxalt & Nomura, Ltd.,* and *Daniel T. Hayward,* Reno, for Petitioners Collette and Scott Lancaster.

*Rands, South & Gardner,* Reno, for Petitioners Monty and Shala Loper.

*Law Offices of Sharon McDonald,* Reno, for Real Parties in Interest.

## OPINION

*Per Curiam:*

On January 21, 1999, fourteen-month-old Azeria Ducharm was removed from the care of her biological parents and made a ward of the State by the Division of Child and Family Services based on allegations of neglect. Since she had several serious and permanent medical conditions that necessitated further evaluation, Azeria was placed in licensed therapeutic foster care. On April 3, 1999, during her placement with the foster parents, Azeria was watched, along with several other children, by a fifteen-year-old babysitter. The babysitter fed, or allowed Azeria to be fed, a hot dog. Azeria choked to death despite the babysitter's attempts to render aid.

Real party in interest Monique Ducharm, individually and as heir and representative for Azeria Ducharm, filed a negligence claim against the State of Nevada, State employees individually, Azeria's foster parents, and the parents of the babysitter charged with Azeria's care at the time of her death. Monique generally alleged that the petitioners had been negligent in: (1) failing to evaluate Azeria's medical needs as a child with special medical conditions; (2) failing to take Azeria's medical needs into consideration in selecting the foster parents; (3) failing to inform the foster parents of Azeria's special needs; (4) failing to seek medical evaluations or treatment regarding Azeria's special needs; and (5) failing to supervise Azeria's care in light of her special medical needs.

Petitioners filed a motion for judgment on the pleadings pursuant to NCRP 12(c) based on the theory of absolute quasi-judicial immunity. Because the district court considered matters outside the pleadings in rendering its judgment, petitioners' motion was treated as one for summary judgment. Thereafter, the district court dismissed Monique's claim for relief regarding the State's failure to have a policy or procedure in place for special needs children. However, the district court refused to dismiss the remaining claims against the petitioners on the grounds of quasi-judicial immunity, concluding that genuine issues of material fact prohibited summary judgment at this early stage of the proceeding.

Petitioners then filed their petition for a writ of mandamus or, in the alternative, a writ of prohibition, compelling the district court to dismiss the claims against them.

For the reasons discussed herein, we conclude that the district court did not err in denying petitioners' motion to dismiss based upon the theory of quasi-judicial immunity.

## DISCUSSION

On January 21, 1999, Monique Ducharm and her domestic partner, Allen Teddy Taylor, were arrested and incarcerated. Five minor children were living with Monique and Taylor at the time of their arrest. Based on the arrest and the living conditions in the home, the children were placed in protective custody. The youngest of these children, Azeria, a fourteen-month-old girl, had several serious and permanent medical conditions.

After an evidentiary hearing, the juvenile division of the district court determined that, because of her medical needs, Azeria should be placed in a licensed therapeutic foster home. The court also ordered additional medical evaluations to devise a case plan that would meet Azeria's special needs. The remaining children were placed in a group home.

Azeria was placed in the care of Scott and Collette Lancaster. On April 3, 1999, the Lancasters entrusted Azeria's care to a fifteen-year-old babysitter. Unfortunately, while in the babysitter's care, Azeria choked on a hot dog and died.

Real party in interest Monique Ducharm, individually and as heir and representative, filed a negligence claim against the State of Nevada, State employees individually, Azeria's foster parents, and the babysitter's parents. The complaint alleged multiple claims for relief.[1] In particular, the complaint asserted that petitioners, the State and its employees, were negligent because the State failed to have adequate policies or procedures in place to address the care of special needs children. In addition, the complaint alleged that the social workers and supervisors assigned to Azeria's case failed to properly: (1) evaluate her medical needs; (2) take her medical needs into consideration in selecting the foster parents; (3) inform the foster parents of Azeria's needs; (4) seek medical treatment or evaluations regarding her needs; and (5) supervise her care in light of her special needs.

After the State indicated its intent to move for dismissal based on absolute immunity, all parties stipulated to a stay of the proceedings pending resolution of the absolute immunity issue. The State defendants moved for judgment on the pleadings pursuant to NRCP 12(c). The State asserted that it and the individual State employees were acting as agents of the courts and, as such, were entitled to absolute quasi-judicial immunity.

---

[1] In her amended complaint, Monique alleged twenty-one claims for relief.

The district court considered matters outside the pleadings, and thus treated the motion as one for summary judgment.[2] The district court dismissed the first claim for relief regarding the State's failure to have a policy or procedure for special needs children, because Monique failed to demonstrate that this failure proximately caused Azeria's death. However, the district court refused to dismiss the remaining claims on the ground of quasi-judicial immunity.

Petitioners assert that they are entitled to *absolute* quasi-judicial immunity and that such immunity protects them not only from litigation but also from the burdens of litigation. They argue that the district court was obligated to grant their motion for judgment on the pleadings and seek a writ of mandamus to compel the district court to dismiss the proceedings against them.

A writ of mandamus is an extraordinary remedy that will not issue if the petitioner has a plain, speedy, and adequate remedy at law.[3] Whether to consider a petition for mandamus is entirely within the discretion of this court.[4] The writ is generally issued to compel the performance of an act that the law requires as a duty resulting from an office, trust or station, or to control an arbitrary or capricious exercise of discretion.[5] However, even when an arguable adequate remedy exists, this court may exercise its discretion to entertain a petition for mandamus under circumstances of urgency or strong necessity, or when an important issue of law needs clarification and sound judicial economy and administration favor the granting of the petition.[6]

Because this case involves an important issue of law, we take this opportunity to clarify the application of absolute quasi-judicial immunity.[7]

The granting of immunity "is a matter of public policy that balances the social utility of the immunity against the social loss of

---

[2]*See* NRCP 12(c); *see also Lumberman's Underwriting v. RCR Printing,* 114 Nev. 1231, 1234, 969 P.2d 301, 303 (1998).

[3]*See* NRS 34.170; NRS 34.330.

[4]*Smith v. District Court,* 107 Nev. 674, 677, 818 P.2d 849, 851 (1991).

[5]NRS 34.160; *see Wardleigh v. District Court,* 111 Nev. 345, 350, 891 P.2d 1180, 1183 (1995); *Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 637 P.2d 534 (1981).

[6]*Smith v. District Court,* 113 Nev. 1343, 1345, 950 P.2d 280, 281 (1997); *Ashokan v. State, Dep't of Ins.,* 109 Nev. 662, 667, 856 P.2d 244, 247 (1993).

[7]Petitioners did not raise below and we take no position regarding whether prosecutorial or discretionary immunity applies to the claims set forth in this case.

being unable to attack the immune defendant.''[8] Absolute immunity is a broad grant of immunity not just from the imposition of civil damages, but also from the burdens of litigation, generally.[9] Judicial immunity originates from the common-law protection of judicial participants[10] which formed a '' 'cluster of immunities protecting the various participants in judge-supervised trials' '' that stemmed '' 'from the characteristics of the judicial process.' ''[11] Judicial immunity serves to "provide[ ] absolute immunity from subsequent damages liability for all persons—governmental or otherwise—who [are] integral parts of the judicial process.''[12] Indeed, a grant of absolute immunity applies even when a judicial officer has been accused of acting maliciously and corruptly.[13] The initial purpose of judicial immunity was to "discourag[e] collateral attacks [against judges] and thereby help[ ] to establish appellate procedures as the standard system for correcting judicial error.''[14] Absolute judicial immunity has been extended to various non-judicial participants in the judicial process. The application of absolute judicial immunity to a non-

[8]James L. Knoll, *Protecting Participants in the Mediation Process: The Role of Privilege and Immunity,* 34 Tort & Ins. L.J. 115, 122 (1998).

[9]*Id.* (noting that absolute immunity is distinguishable from qualified immunity, an affirmative defense the defendant must plead). Whereas absolute immunity defeats a suit at the outset of litigation as long as the official's actions were within the scope of the immunity, qualified immunity depends on the circumstances and motivation of the official's actions as established by evidence presented at trial. *See also Imbler v. Pachtman,* 424 U.S. 409, 419 n.13 (1976).

[10]*Briscoe v. LaHue,* 460 U.S. 325, 332 n.12 (1983) (stating that '' '[t]he demands of public policy on which the rule [of absolute immunity] is based are so controlling that there is only one considered case in the English or American reports in which the existence of the general doctrine of absolute immunity under the common law has ever been questioned' '' (quoting Van Vechten Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 Colum. L. Rev. 463, 465-66 (1909))); *see also Cutler v. Dixon,* 76 Eng. Rep. 886 (K.B. 1585); *Anfield v. Feverhill,* 80 Eng. Rep. 1113 (K.B. 1614); *Henderson v. Broomhead,* 157 Eng. Rep. 964, 968 (Ex. Ch. 1859); *Dawkins v. Lord Rokeby,* 176 Eng. Rep. 800, 812 (C.P. 1866).

[11]*Briscoe,* 460 U.S. at 335 (quoting *Butz v. Economou,* 438 U.S. 478, 512 (1978)). The United States Supreme Court first recognized the doctrine of judicial immunity in *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347 (1871), where it concluded that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."

[12]*Briscoe,* 460 U.S. at 335.

[13]*Imbler,* 424 U.S. at 418 n.12 (quoting *Pierson v. Ray,* 386 U.S. 547, 553-54 (1967)).

[14]*Forrester v. White,* 484 U.S. 219, 225 (1988); *see also Mireles v. Waco,* 502 U.S. 9, 9-13 (1991).

judicial officer depends not on the status of the individual, but on the function the individual serves with respect to the judicial process.[15] That is, absolute *quasi-judicial* immunity has been extended to individuals who perform functions integral to the judicial process. For example, absolute quasi-judicial immunity applies to witnesses, official or private, deriving their power from long recognized common-law principles protecting witness testimony.[16] Additionally, absolute quasi-judicial immunity has been extended to prosecutors[17] and executive branch officials acting in a prosecutorial capacity (*i.e.,* administrative law judges, hearing examiners and agency officials).[18] However, the United States Supreme Court has declined to extend absolute quasi-judicial immunity to presidential aides,[19] court reporters,[20] public defenders[21] and the United States Attorney General when not acting in a prosecutorial capacity.[22]

In *Butz v. Economou,*[23] the Supreme Court considered three factors that would support an award of absolute quasi-judicial immunity. First, they considered whether the official in question performed functions sufficiently comparable to those of officials who have traditionally been afforded absolute immunity at common law (*i.e.,* "functional inquiry"). Second, they considered whether the likelihood of harassment or intimidation by personal liability was sufficiently great to interfere with the official's performance of his or her duties. Third, they considered whether procedural safeguards exist in the system that would adequately protect against unconstitutional conduct by the official.[24] These factors "reflect the fundamental justification for absolute judicial immunity: where other means exist to correct errors, decision-makers in the judicial process must be free to exercise their discretion without fear of personal consequences."[25]

---

[15]Knoll, *supra* note 8, at 124; *see also Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 434-36 (1993).

[16]*Briscoe,* 460 U.S. at 336 n.15.

[17]*Imbler,* 424 U.S. at 431 (immunity granted to prosecutors in initiating a prosecution and in presenting the state's case); *see also Yaselli v. Goff,* 275 U.S. 503 (1927) (extending absolute immunity to federal prosecutors through summary affirmance), *aff'g* 12 F.2d 396 (2d Cir. 1926).

[18]*Butz v. Economou,* 438 U.S. 478, 508-17 (1978).

[19]*Harlow v. Fitzgerald,* 457 U.S. 800, 808-13 (1982).

[20]*Antoine,* 508 U.S. at 434-37.

[21]*Tower v. Glover,* 467 U.S. 914, 921-23 (1984).

[22]*Mitchell v. Forsyth,* 472 U.S. 511, 520-24 (1985).

[23]438 U.S. at 513-17.

[24]Caroline Turner English, *Stretching the Doctrine of Absolute Quasi-Judicial Immunity:* Wagshal v. Foster, 63 Geo. Wash. L. Rev. 759, 765-66 (1995).

[25]*Id.* at 768 (citing *Bradley,* 80 U.S. at 347).

Adhering to this functional approach, the Court has concluded that the burden of justifying absolute quasi-judicial immunity rests on the official asserting the claim.[26] Specifically,

> the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been ''quite sparing'' in our recognition of absolute immunity, and have refused to extend it any ''further than its justification would warrant.''[27]

Following the Court's decision in *Butz,* lower courts have extended absolute quasi-judicial immunity to non-judicial officers, primarily in the context of civil actions asserting violations of 42 U.S.C. § 1983. In *Miller v. Gammie,*[28] the circuit court of appeals extended absolute quasi-judicial immunity for the placement of a child in a foster home to state child services workers involved in ongoing state court dependency proceedings. The court concluded that, because the child services workers' actions took place in '' 'connection with, and incident to, ongoing child dependency proceedings,' '' the workers were entitled to absolute immunity even when claims of intentional wrongdoing were asserted.[29] The court's decision in *Miller* was based upon previous grants of absolute quasi-judicial immunity to social service workers engaged in the investigation of child abuse allegations[30] and to social service workers performing investigative and placement services in child dependency proceedings.[31] Other jurisdictions have similarly followed suit.[32]

---

[26]*Antoine,* 508 U.S. at 432; *Harlow,* 457 U.S. at 812 (citing *Butz,* 438 U.S. at 506).

[27]*Burns v. Reed,* 500 U.S. 478, 486-87 (1991) (citations omitted); *id.* at 500 (Scalia, J., concurring in part and dissenting in part) (noting that the ''touchstone for [absolute judicial immunity] was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights'').

[28]292 F.3d 982, 989-90 (9th Cir. 2002).

[29]*Id.* at 990 (quoting *Babcock v. Tyler,* 884 F.2d 497, 503 (9th Cir. 1989)).

[30]*Mabe v. San Bernardino County, Dept. of Soc. Serv.,* 237 F.3d 1101 (9th Cir. 2001).

[31]*Babcock v. Tyler,* 884 F.2d 497 (9th Cir. 1989).

[32]*See, e.g., Puricelli v. Houston,* No. CIV.A.99-2982, 2000 WL 760522 at *6 (E.D. Pa. June 12, 2000) (allowing that child social service workers would be absolutely immune for their decision to initiate a child abuse investigation); *Gardner by Gardner v. Parson,* 874 F.2d 131, 146 (3d Cir. 1989) (concluding that a guardian ad litem would be absolutely immune in exercising functions ''such as testifying in court, prosecuting custody or neglect petitions, and making reports and recommendations to the court in which the

This court has, in limited circumstances, granted absolute quasi-judicial immunity to non-judicial officers. In *Duff v. Lewis,*[33] we granted absolute quasi-judicial immunity to a court-appointed psychologist involved in evaluating individuals in the context of a custody dispute when allegations of physical and sexual abuse had been made. Even though the psychologist had been the subject of disciplinary sanctions by the Nevada State Board of Psychological Examiners for his conduct during the evaluations, this court concluded that " '[a]bsolute immunity [was] necessary to assure that judges, advocates, and witnesses [could] perform their respective functions without harassment or intimidation.' "[34] This court cited five "policy reasons" for allowing absolute immunity: " '(1) the need to save judicial time in defending suits; (2) the need for finality in the resolution of disputes; (3) to prevent deterring competent persons from taking office; (4) to prevent the threat of lawsuit from discouraging independent action; and (5) the existence of adequate procedural safeguards such as change of venue and appellate review.' "[35]

In a case involving the same parties, we extended absolute quasi-judicial immunity to court-appointed special advocates (CASA) involved in a child abuse investigation.[36] This court concluded that CASA volunteers were an integral part of the judicial process and that public policy considerations militated in favor of immunity for their actions during child abuse investigations.[37] Similarly, in *Matter of Fine,*[38] this court reaffirmed the proposition that court-appointed experts are entitled to absolute quasi-judicial immunity when they provide information that a court may utilize in rendering a decision because they act, in that context, as an arm of the court.[39]

---

guardian acts as an actual functionary or arm of the court"); *Malachowski v. City of Keene,* 787 F.2d 704, 712 (1st Cir. 1986) (extending absolute quasi-judicial immunity to a city juvenile officer accused of filing a false delinquency petition); *Demoran v. Witt,* 781 F.2d 155, 158 (9th Cir. 1986) (extending judicial immunity to probation officers in preparing pre-sentence investigations even where bad faith and malice have been alleged); *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984) (extending absolute immunity to state social service workers, a psychologist and two psychiatrists in a suit involving the termination of parental rights).

[33] 114 Nev. 564, 571, 958 P.2d 82, 87 (1998).

[34] *Id.* at 569, 958 P.2d at 85 (quoting *Butz,* 438 U.S. at 512).

[35] *Id.* (quoting *Lavit v. Superior Court,* 839 P.2d 1141, 1144 (Ariz. Ct. App. 1992)).

[36] *Foster v. Washoe County,* 114 Nev. 936, 943, 964 P.2d 788, 793 (1998).

[37] *Id.* at 942-44, 964 P.2d at 792-93.

[38] 116 Nev. 1001, 1015, 13 P.3d 400, 409 (2000).

[39] *Id.* at 1015, 13 P.3d at 409.

In the present case, the record reveals that the State and its agents exercised their statutory authority to investigate and provide for the protective care and custody of Azeria.[40] Ducharm does not dispute that the State and its agents are immune from liability for the decision to place Azeria in protective custody, or for recommending that she be made a ward of the court and placed in a foster home. Rather, Ducharm is challenging the selection and supervision of the foster parents as well as the handling of Azeria's case once she was placed in a foster home.

The State contends that Azeria was a ward of the juvenile court,[41] and that all actions taken by State employees to place her in foster care and supervise her case were done pursuant to court order and as agents of the court. As such, the employees were quasi-judicial officers and entitled to absolute judicial immunity. Thus, the State asserts the district court should have dismissed the claims against the State and its employees.

We conclude that State employees engaged in child protective services are entitled to quasi-judicial immunity when they provide information to the court (*e.g.,* reports, case plans, testing evaluations and recommendations) pertaining to a child who is or may become a ward of the State. We do not intend the aforementioned examples to be an exclusive list. Rather, they demonstrate some of the duties protective service workers engage in that are integral to the court's decision-making processes. When a state agency or its employees provide their decision-making expertise to the court, they act as an arm of the court and are entitled to absolute quasi-judicial immunity.[42] However, once the court makes a decision ratifying the recommendations of the state agency (*e.g.,* placement in foster care, need for further medical evaluation, etc.), the state agency and its employees are no longer acting as an arm of the court. Rather, their function in carrying out the order of the court falls within the executive branch of government and pursuant to their statutory duties. Specifically, quasi-judicial immunity does not apply to state agencies or their employees for the day-to-day management and care of their wards.

---

[40]*See* NRS 432B.260; NRS 432B.390.

[41]We note that Azeria was made a ward of the State by the district court. The term "ward of the court" is an inaccurate, archaic term insofar as the court reviews and issues orders based upon recommendations made by an agency that provides child welfare services. *See* NRS 432B.044 (defining "child welfare services"); NRS 432B.050 (defining "court"); NRS 432B.550 (determination of child custody by court); NRS 432B.553 (noting that an agency that obtains legal custody of a child pursuant to NRS 432B.550 shall adopt a permanent placement plan for the child for review by the court).

[42]This conclusion accords with the analysis set forth by the United States

In the present case, Monique has not challenged the recommendations made to the district court by the petitioners regarding Azeria's placement and medical needs. Rather, she has alleged negligence on the part of the petitioners for actions taken or not taken after the district court's order made Azeria a ward of the State. Consequently, petitioners are not entitled to quasi-judicial immunity.

We decline to broadly extend the doctrine of quasi-judicial immunity to every action taken by a State employee while supervising the care of foster children. Thus, the district court did not err in refusing to dismiss the claims.[43] While some of Monique's claims may be barred by prosecutorial or discretionary immunity, these issues are not before us and cannot be resolved until the factual basis for the claims is fully articulated.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in refusing to dismiss the claims against the petitioners on the ground of quasi-judicial immunity. Accordingly, we deny the petition for a writ of mandamus or, in the alternative, a writ of prohibition.

---

Supreme Court in *Butz* and followed by this court in *Duff*. Specifically, child welfare workers engaged in protective service evaluations function as advisors to the court. They provide recommendations based upon their expertise and judgment upon which the courts base their determinations. Thus, in this limited capacity, child welfare workers provide an invaluable and singular service to the court, offering recommendations within adversarial proceedings between the state and the natural parent. Further, were child welfare workers subject to personal liability for every recommendation made to the court in these situations, the judicial system would be overburdened with civil suits and such liability would likely prevent competent persons from taking positions as child welfare workers as the threat of lawsuit would discourage independent action. Additionally, opening the gate to personal liability for recommendations made to the court by child welfare workers would impede the resolution and finalization of petitions seeking the safe placement of this State's children. Finally, adequate procedural safeguards exist within the system to protect against unconstitutional conduct by a state employee or agency which precludes the necessity for civil liability for recommendations made to the court on the issues of child welfare (*i.e.*, appellate review, professional disciplinary proceedings, etc.). *See Butz*, 438 U.S. at 513-17; *Duff*, 114 Nev. at 569, 958 P.2d at 85.

[43]*See, e.g., Simpson v. Mars Inc.*, 113 Nev. 188, 190, 929 P.2d 966, 967 (1997).