131 Nev.. Advance Opinion 92

IN THE SUPREME COURT OF THE STATE OF NEVADA

<table>
<tr><td>VIVIAN MARIE LEE HARRISON,<br>Appellant,<br>vs.<br>NORTON A. ROITMAN, M.D.,<br>Respondent.</td><td>No. 64569<br><br>FILED<br><br>DEC 17 2015<br><br>TRACIE K. LINDEMAN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK</td></tr>
</table>

Appeal from a district court order dismissing a medical malpractice action. Eighth Judicial District Court, Clark County; Kenneth C. Cory, Judge.

*Affirmed.*

John Ohlson, Reno,
for Appellant.

John H. Cotton & Associates, Ltd., and John H. Cotton and John J. Savage, Las Vegas,
for Respondent.

———————————

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, DOUGLAS, J.:

In this opinion, we consider whether a party-retained expert providing a psychiatric analysis of an adverse party during divorce proceedings may later be sued by the adverse party based on statements made in his written psychiatric analysis report. In accordance with long-established precedent extending absolute immunity to judicial participants, we recognize that party-retained expert witnesses have

2/8/16: Corrected per letter to publishers. CT

15-38500

absolute immunity from suits for damages arising from statements made in the course of judicial proceedings.

## FACTS AND PROCEDURAL HISTORY

This action arose from a divorce proceeding to which Vivian Harrison (Vivian) and Kirk Harrison (Kirk) were parties. During the divorce proceeding, Kirk hired psychiatrist Norton Roitman, M.D., to conduct a psychiatric analysis of his then-wife, Vivian. Despite never examining or meeting Vivian, Dr. Roitman prepared and submitted to the court a written report diagnosing Vivian with a personality disorder and concluding that her prognosis was poor.

Consequently, Vivian filed a complaint against Dr. Roitman, alleging that the statements made in his report constituted medical malpractice, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy. According to Vivian, Dr. Roitman's statements were founded solely on information obtained from Kirk, and his diagnosis, given without meeting or examining her, fell below the standard of care for a psychiatrist.

Dr. Roitman subsequently filed an NRCP 12(b)(5) motion to dismiss, which was granted by the district court. The district court concluded that, as a witness preparing an expert report in connection with the matter in controversy, Dr. Roitman was absolutely immune from liability for each of Vivian's causes of action. Vivian appealed.

## DISCUSSION

An order granting a motion to dismiss pursuant to NRCP 12(b)(5) is subject to a rigorous review. *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 227-28, 181 P.3d 670, 672 (2008). This court recognizes all factual allegations in the complaint as true and draws all

inferences in favor of the complainant. *Id.* at 228, 181 P.3d at 672. Thus, Vivian's complaint should only be dismissed if it appears beyond a doubt that no factual allegations, taken as true, would entitle her to relief. *Id.* In this case, the validity of the district court's order granting dismissal turns on whether it correctly applied the doctrine of absolute immunity, which is a question of law that we review de novo. *See Fink v. Oshins*, 118 Nev. 428, 432, 49 P.3d 640, 643 (2002).

On appeal, Vivian contends that the district court improperly dismissed her complaint because Nevada limits the availability of an absolute immunity defense to claims for defamation. Because her complaint alleges medical malpractice rather than defamation, she argues that Dr. Roitman's defense of absolute immunity does not apply. In opposition, Dr. Roitman contends that he is entitled to the protection of absolute immunity because he made the challenged statements as an expert participating in a judicial proceeding. He further contends that his claim of absolute immunity is not contingent upon the type of action brought by Vivian.

Absolute immunity, a doctrine rooted in the common law, "is a broad grant of immunity not just from the imposition of civil damages, but also from the burdens of litigation, generally." *State v. Second Judicial Dist. Court (Ducharm)*, 118 Nev. 609, 615, 55 P.3d 420, 423 (2002) (citing James L. Knoll, *Protecting Participants in the Mediation Process: The Role of Privilege and Immunity*, 34 Tort & Ins. L.J. 115, 122 (1998)). Questions of immunity are driven by public policy, requiring a balancing of "the social utility of the immunity against the social loss of being unable to attack the immune defendant." *Id.* at 614-15, 55 P.3d at 423. The doctrine is further "'justified and defined by the *functions* it protects and

serves.'" *Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)); *see also Briscoe v. LaHue*, 460 U.S. 325, 342 (1983) ("[O]ur cases clearly indicate that immunity analysis rests on functional categories."). Thus, in analyzing this issue, we are mindful that "'functional categories, not . . . the status of the defendant' control[s] the immunity analysis." *Rolon*, 517 F.3d at 145.

The United States Supreme Court has applied this "functional approach" to resolving questions of immunity. *See, e.g., Briscoe*, 460 U.S. at 335-36 (determining by application of the functional approach that a testifying police officer was protected by absolute witness immunity because while testifying he served the same functions as other witnesses); *Buckley v. Fitzsimmons*, 509 U.S. 259, 259 (1993) (applying the functional approach to determine whether qualified or absolute immunity applied to state actors accused of malicious prosecution).[1] This court applied the Supreme Court's functional approach in *Ducharm* to reach the conclusion that child protective service agents, integral constituents of the court process, act under the protection of absolute immunity when they provide information to the court.[2] 118 Nev. at 615-19, 55 P.3d at 424-26. We

---

[1]In his concurrence, Justice Kennedy squarely rejects an analysis supplemented by bright-line rules rather than one established entirely on function. 509 U.S. at 289 (Kennedy, J., concurring). He explains that "ensuring parity in treatment among . . . actors engaged in identical functions" was the precise goal of the functional analysis. *Id.* at 288-89.

[2]In *Ducharm*, we ultimately held that the district court did not err by refusing to dismiss the claims based on a defense of absolute immunity because the alleged negligence occurred after the court order was entered. 118 Nev. at 620, 55 P.3d at 427.

 

similarly employ the functional approach here to determine whether the social utility of recognizing absolute immunity for party-retained experts is sufficiently great to justify their pardon from the burdens of litigation. We are convinced that, much like the child protective service agents in *Ducharm*, party-retained expert witnesses play an integral role in our judicial process.[3]

*The functional approach*

The functional approach is made up of three separate inquiries. *Id.* at 616, 55 P.3d at 424. First, we ask "whether the [person seeking immunity] performed functions sufficiently comparable to those of [persons] who have traditionally been afforded absolute immunity at common law." *Id.*; *see also Butz v. Economou*, 438 U.S. 478, 513 (1978) (comparing the role of a federal hearing examiner with the role of a judge and concluding that they are "functionally comparable"). Second, we consider "whether the likelihood of harassment or intimidation by personal liability [is] sufficiently great to interfere with the [person's] performance of his or her duties." *Ducharm*, 118 Nev. at 616, 55 P.3d at 424; *see also Butz*, 438 U.S. at 513 (concluding that the fractious nature of adjudications within a federal administrative agency, and the likelihood of harassing litigation evolving therefrom, are similar to the judicial process). Third, we ask "whether procedural safeguards exist in the system that would adequately protect against [illegitimate] conduct by the [person seeking immunity]." *Ducharm*, 118 Nev. at 616, 55 P.3d at 424-25

---

[3]*See also Briscoe*, 460 U.S. at 345-46 (noting that the participation of witnesses "in bringing the litigation to a just—or possibly unjust—conclusion is . . . indispensable").

(citing Caroline Turner English, *Stretching the Doctrine of Absolute Quasi-Judicial Immunity: Wagshal v. Foster*, 63 Geo. Wash. L. Rev. 759, 765-66 (1995)); *see also Butz*, 438 U.S. at 513 (concluding that federal administrative law requires many of the same safeguards as the judicial process and extending immunity to persons performing adjudicatory functions within federal agencies).

*Immunity at common law*

At common law, "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established." *Briscoe*, 460 U.S. at 330-31[4] (footnote omitted) (citing *Cutler v. Dixon* (1585) 76 Eng. Rep. 886; 4 Co. Rep. 14b.; *Anfield v. Feverhill* (1614) 80 Eng. Rep. 1113; 1 Ro. Rep. 61; *Henderson v. Broomhead* (1859) 157 Eng. Rep. 964, 968; 4 H. & N. 569). Quoting a 19th century court, the United States Supreme Court reasoned that "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Id.* at 332-33 (quoting *Calkins v. Sumner*, 13 Wis. 193, 197 (1860)). The Court further explained that "[a] witness's apprehension of subsequent damages liability might induce two forms of self-censorship." *Id.* at 333. First, a witness may be reluctant to present

---

[4]As noted, *Briscoe* extended witness immunity to testifying police officers. 460 U.S. at 346. Justice Marshall dissented. *Id.* Notably, he argued that support for witness immunity at common law was not as well-recognized as the majority presumed. *Id.* at 363 (Marshall, J., dissenting). Nonetheless, the U.S. Supreme Court has continued to recognize witness immunity as a well-established, common-law principle. *See, e.g., Forrester v. White*, 484 U.S. 219, 226 (1988).

testimony due to fear of subsequent damages liability. *Id.* Second, even if a witness makes it to the stand, he may color his testimony as a consequence of the same fear. *Id.* In particular, "[a] witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." *Id.* Rather than subject witnesses to potential liability for their statements, "the truth-finding process is better served if the witness's testimony is submitted to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Id.* at 333-34 (internal quotation omitted); *see also Imbler v. Pachtman*, 424 U.S. 409, 439 (1976) (White, J., concurring) (stating that to find where the truth lies, a witness "must be permitted to testify without fear of being sued if his testimony is disbelieved"). The common law's protection for witnesses is therefore "a tradition . . . well grounded in history and reason." *Briscoe*, 460 U.S. at 334.

### *The looming threat of liability*

We next consider whether harassment or intimidation by threat of personal liability may interfere with a party-retained expert's duties. As to experts appointed by the court, we have concluded that "[e]xposure to liability could deter their acceptance of court appointments or color their recommendations." *Duff v. Lewis*, 114 Nev. 564, 569, 958 P.2d 82, 86 (1998) (internal quotation omitted). When we recognized immunity for court-appointed experts, we offered that our purpose was to "preserve the . . . truthfulness of critical judicial participants without subjecting them to the fear and apprehension that may result from a

SUPREME COURT
OF
NEVADA

(O) 1947A

threat of personal liability." *Id.* at 568-69, 958 P.2d at 85. Our decision to extend absolute immunity, then, removed the possibility that court-appointed experts would become a "lightning rod for harassing litigation." *Id.* at 569, 958 P.2d at 86 (internal quotation omitted).

After considering the threat of liability posed to court-appointed experts together with the threat faced by party-retained experts, we conclude that the threat faced by party-retained experts is as great as, or greater than, the threat to court-appointed experts, for whom we have previously recognized absolute immunity. *See, e.g., id.* at 571, 958 P.2d at 87 (recognizing immunity for a court-appointed psychologist making a child custody recommendation). Both classes of experts, notwithstanding source of hire, risk exposure to lawsuits when providing expert opinions as participants in contentious judicial proceedings. *See Butz*, 438 U.S. at 512 (explaining that devoid of absolute immunity, judicial participants risk exposure to liability). Court-appointed experts, however, are afforded the cloak of neutrality associated with their appointments. *See Duff*, 114 Nev. at 570, 958 P.2d at 86 (noting that court-appointed experts' purpose is to act in an objective and independent manner). In contrast, party-retained experts, like the often imposed label "hired gun" denotes, are strongly associated with the hiring party. And as a consequence of their relationship with the hiring party, the hired gun will likely share in the threat of liability arising from the losing party's animus. As the *Butz* Court explained: "[C]ontroversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with [unlawful] animus." 438 U.S. at 512. Accordingly, to grant absolute immunity to court-appointed experts, who might avoid a losing

party's animus by demonstrating objectivity, but to refuse it to party-retained experts, who likely face greater animus by association, would be to expose party-retained experts as a "'lightning rod for harassing litigation.'" *Duff*, 114 Nev. at 569, 958 P.2d at 86 (quoting *Lavit v. Superior Court*, 839 P.2d 1141, 1144 (Ariz. Ct. App. 1992)).

We further conclude that the looming threat of liability would interfere with party-retained experts' duties. The potential for liability could encumber access to experts in two ways. First, party-retained experts would be discouraged from accepting retainers. *See id.* at 570, 958 P.2d at 86 (noting that exposure to liability could deter court-appointed experts from accepting appointments). Second, experts would be forced to carry insurance or set retainers exorbitantly high to warrant the risk of taking the stand, putting their price tag out of reach for many parties. The Washington Supreme Court explained: "[I]mposing civil liability on expert witnesses would discourage anyone who is not a full-time professional expert witness from testifying. Only professional witnesses will be in a position to carry insurance to guard against such liability." *Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.*, 776 P.2d 666, 670 (Wash. 1989). Even if a party is able to retain an expert who dares to risk collateral suit by taking the stand, and is additionally able to afford the expert's price tag, the retained expert may dilute or distort disagreeable conclusions to reduce the risk of liability. *See Briscoe*, 460 U.S. at 332 (noting that the threat of liability would cause witnesses to distort candid opinions). Thus, we conclude that to permit collateral actions against party-retained experts based on statements made during judicial proceedings would be to discourage candid expert opinions and to suppress access. *See Duff*, 114 Nev. at 570, 958 P.2d at 86 (noting that exposure of

Supreme Court
of
Nevada

(O) 1947A

court-appointed experts to suit would likely cause a chilling effect on acceptance of court appointments). And in so doing, we will have stifled the ascertainment of truth, a result we seek to avoid. *See Briscoe*, 460 U.S. at 332 (noting that the path to truth is obstructed by witness's self-censoring).

### Procedural safeguards as remedies

As to the final consideration, whether remedies and safeguards other than civil liability are sufficient to hold party-retained experts accountable for their conduct, we conclude that they are. In *Duff*, we recognized the availability of cross-examination, change of venue, imposition of sanctions, and appellate review as adequate safeguards. 114 Nev. at 571, 958 P.2d at 87. Other jurisdictions have similarly recognized the adequacy of procedural safeguards built into the judicial system. *See Lythgoe v. Guinn*, 884 P.2d 1085, 1089 (Alaska 1994) (recognizing that change of venue and appellate review are adequate procedural safeguards to hold court-appointed experts accountable for negligence); *LaLonde v. Eissner*, 539 N.E.2d 538, 542 (Mass. 1989) (observing as adequate the availability of cross-examination, appellate review, and a request for modification). The United States Supreme Court has additionally acknowledged the check on unpersuasive evidence provided by the impartial trier of facts as a procedural safeguard. *See Butz*, 438 U.S. at 517 ("Evidence which is false or unpersuasive should be rejected upon analysis by an impartial trier of fact.").

Here, Vivian was at liberty to avail herself of any number of remedies. For instance, she might have cross-examined Dr. Roitman to establish the negligent method from which his diagnosis and prognosis

were derived. We note, however, that the extent to which Vivian actually took advantage of available remedies is unclear from the record.[5] Even so, our determination is not contingent upon a factual finding that Vivian successfully utilized the remedies at her disposal. Thus, we satisfy the final query of the functional approach by simply noting the existence of these safeguards. *See Duff*, 114 Nev. at 570, 958 P.2d at 86 (noting the existence of procedural remedies, but not questioning whether the claimant actually availed himself); *see also Ducharm*, 118 Nev. at 616, 55 P.3d at 425 (noting that the third inquiry is "whether procedural safeguards *exist*" (emphasis added)).

*Absolute immunity under Nevada law*

Despite our conclusions, derived from the United States Supreme Court's functional approach and grounded in common law, Vivian argues that Nevada has not, and should not now, extend the defense of absolute immunity beyond defamation claims. We note that the cases of *Duff* and *Foster* negate Vivian's assertion. In *Duff*, we applied absolute immunity to a court-appointed psychologist accused of negligence in making a child custody recommendation amidst allegations of child abuse. 114 Nev. at 571, 958 P.2d at 87. Similarly, in *Foster v. Washoe County*, we granted absolute immunity to court-appointed special advocates sued for negligent investigation of child abuse. 114 Nev. 936, 943, 964 P.2d 788, 793 (1998). These applications of absolute immunity to claims for negligence demonstrate that we have not limited the doctrine's

---

[5]The district court questioned Vivian's failure to exclude Dr. Roitman as an expert witness, to impeach his testimony, or to seek sanctions, but this discussion failed to make the record more clear.

application to claims for defamation.[6] This court has not in fact made an issue of the type of claim brought when considering the availability of an absolute immunity defense, and we do not at present find good reason to depart from that convention.

*An unobstructed path to truth*

Vivian additionally argues that because expert witnesses are procured to testify to the benefit of a hiring party, the goal of ensuring that the path to truth is unobstructed is not advanced by immunizing experts from negligence. She argues that the immunity that applies to a court-appointed expert, who is a neutral expert appointed by the court to assist the trier of fact, should not be afforded to a party-retained expert, who is a partisan witness advocating a position for a party. We disagree. Experts may be sought after and procured subject to the understanding that they will provide statements in support of a party's particular position. However, under the law, an expert opinion is not admitted to assist one party or the other; rather, it is admitted to assist the trier of

---

[6]The common-law and United States Supreme Court jurisprudence indicate that absolute immunity protects witness statements made during judicial proceedings from tort liability *in general* and do not limit absolute immunity's application to defamation claims. *See Briscoe*, 460 U.S. at 335 ("[T]he common law provided absolute immunity from subsequent *damages liability* for all persons—governmental or otherwise—who were integral parts of the judicial process." (emphasis added)). We note, however, that our application of absolute immunity has limitations. *See Alioto v. City of Shively*, 835 F.2d 1173, 1174 n.1 (6th Cir. 1987) ("[T]he doctrine of witness immunity does not shield from liability alleged conspiracies to falsify nontestimonial evidence."). Our adoption of the doctrine does not protect an expert's fraudulent acts.

fact by providing specialized knowledge. NRS 50.275;[7] *see also Panitz v. Behrend*, 632 A.2d 562, 565 (Pa. 1993) ("The primary purpose of expert testimony is not to assist one party or another in winning the case but to assist the trier of the facts in understanding complicated matters."). Once testimony is admitted, it is for the trier of fact to weigh the credibility of the expert's opinion and for additional safeguards to advance truth-finding. *See Briscoe*, 460 U.S. at 333-34 (noting that the fact-finder determines where the truth lies). It is in this light we conclude that the path to truth is best paved by immunizing expert witnesses, court-appointed or party-retained, from tort liability.

Accordingly, even if the factual allegations contained in Vivian's complaint were true, as a matter of law, Dr. Roitman's defense of absolute immunity precludes her claim, and the district court properly dismissed each of her causes of action.[8]

---

[7]NRS 50.275 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge."

[8]Dr. Roitman also contends that there was no doctor-patient relationship, and thus, he owed no duty of care to Vivian. We conclude that our holding as to absolute immunity is dispositive, and we therefore need not address this issue.

Based on the foregoing, we affirm the district court's order of dismissal.

_____, J.
Douglas

We concur:

_____, C. J.
Hardesty

_____, J.
Parraguirre

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Gibbons

_____, J.
Pickering